**BLUE CHIP CAPITAL FUND II LIMITED PARTNERSHIP, and Blue Chip IV Limited Partnership, Plaintiffs,**

v.

**Jerry L. TUBERGEN, Randall S. Damstra, Mary L. Campbell, William G. Petty, Jr., and HCS Infusion Services, Inc., Defendants.**

**C.A. No. 1611-N.**

Court of Chancery of Delaware,
New Castle County.

Submitted: June 8, 2006.
Decided: Aug. 22, 2006.

Allen M. Terrell, Jr., Esquire, John D. Hendershot, Esquire, Grainne O. Murphy, Esquire, Richards, Layton & Finger, Wilmington, Delaware; L. Clifford Craig, Esquire, Russell S. Sayer, Esquire, Taft, Stettinius & Hollister LLP, Cincinnati, Ohio, Attorneys for the Plaintiffs.

John L. Reed, Esquire, Paul D. Brown, Esquire, Joseph B. Cicero, Esquire, Edwards Angell Palmer & Dodge LLP, Wilmington, Delaware, Attorneys for Defendants Jerry L. Tubergen, Randall S. Damstra, Mary L. Campbell, and William G. Petty, Jr.

J. Travis Laster, Esquire, Matthew F. Davis, Esquire, Abrams & Laster LLP, Wilmington, Delaware, Attorneys for Defendant HCS Infusion Services, Inc.

### OPINION AND ORDER

LAMB, Vice Chancellor.

A minority preferred stockholder claims that the board breached the company's certificate of incorporation when, after the sale of substantially all of the company's assets, it distributed an inflated amount of the proceeds to the holders of a class of preferred stock which included the company's controller. The stockholder brings this suit both derivatively and directly against the individual directors for breach of fiduciary duty and against the company for breach of contract and for breach of an implied covenant of good faith and fair dealing. The directors and the corporation move under Court of Chancery Rule 12(b)(6) to dismiss the action for failure to state a claim upon which relief may be granted.

The court concludes that the allegations are sufficient to sustain a direct claim against the company for breach of contract and breach of the implied covenant of good faith and fair dealing. Moreover, because it appears the plaintiffs can achieve a full recovery if they are successful on their contract-based claims, the related, but secondary, claims for breach of fiduciary duty (based on the same facts) should be dismissed.

### I.

#### A. *The Parties*

The defendant HCS Infusion Services, Inc., a Delaware corporation, is one of the largest providers of home respiratory therapy and home medical products and services in the United States.[1] The company has a seven member board of directors which includes the defendants Jerry L. Tubergen, Randall S. Damstra, Mary L. Campbell, and William G. Petty, Jr. Tubergen and Damstra are officers of RDV Corporation which, through RDV Homecare,

---

1. The facts recited in this opinion are taken from the well pleaded allegations of the first amended complaint ("Compl."), unless otherwise noted, and are presumed to be true for the purposes of this motion.

LLC, exercises approximately 98% of HCS's voting power and owns approximately two-thirds of its equity.[2] Campbell is a general partner of Enterprise Development Fund II L.P., a venture capital fund that is a minority stockholder in HCS.[3] RDV and Enterprise own all of the Class H preferred shares in the company. Petty is a managing director of Beecken Petty & Company, a private investment management firm, in which RDV is a major investor. RDV appointed Tubergen, Damstra, Campbell, and Petty to serve as HCS directors.[4]

The plaintiffs Blue Chip Capital Fund II Limited Partnership and Blue Chip IV Limited Partnership, collectively referred to as Blue Chip, are Ohio limited partnerships that provide venture capital and other assistance to companies. Blue Chip owns 500 shares of HCS's Class G preferred stock, which apparently represents more than 44% of the minority equity value of that company.

## B. *Background*

In May 2003, HCS sold substantially all of its assets for nearly $116 million in cash pursuant to an asset purchase agreement. That agreement contained a two-year indemnity obligation, capped at $20 million, to cover potential breaches of the covenants, representations, and warranties in the agreement as well as other liabilities not assumed by the buyer.[5] Blue Chip does not challenge this transaction or its terms. After the satisfaction of undisputed debts and liabilities of the company, the net proceeds were approximately $62 million.

The company's certificate of incorporation provides that, in the event of a sale of substantially all of the company's assets, the Series H preferred stockholders are entitled to receive a certain preference payment referred to as the Makewell amount. The certificate provides that the Makewell amount is to be calculated based on a specific formula, which depends upon two factors: (1) the date of the liquidation event,[6] and (2) the amount of the net distributable assets as defined in the certificate.[7] The calculation works in such a way that the later the date of the liquidation

2. The capital stock of the company consists of a single class of common stock and ten series of preferred stock referred to as Classes A, B, C, D, E, F, G, H, I, and M. RDV owns 98% of the company's Class I preferred stock, which is the only class of the company's preferred or common stock with voting rights. RDV also owns approximately 97% of the company's Class H preferred stock, approximately 97% of the company's Class F preferred stock, approximately 23% of the company's Class C preferred stock, and approximately 24% of the company's Class B preferred stock.

3. Enterprise beneficially owns 425 shares of the company's Class H preferred stock, 425 shares of the company's Class F preferred stock, and 103,737 shares of the company's Class B preferred stock.

4. Under the company's Second Amended and Restated Shareholders Agreement, RDV has the power to designate four of the company's seven directors.

5. As security for the indemnity, the company agreed to escrow $12 million of the purchase price, with $6 million to be released in six months and the balance to be released in 12 months. Currently, substantially all of the funds in escrow have been released to the company.

6. The "liquidation event" is defined in the charter as "the liquidation, dissolution or winding up of the company, whether voluntary or involuntary." Compl. § 37.

7. The certificate defines "net distributable assets" as the "net assets of the company available for distribution to the company's shareholders upon the liquidation, dissolution or winding up of the affairs of the company, whether voluntary or involuntary, after payment or provision for payment of all of the debts and liabilities of the company." Compl. § 40.

event and the lower the amount of net distributable assets, the greater the Makewell amount paid to the Class H preferred stockholders, and, consequently, the lower the amount of assets available to be distributed to the other stockholders such as Blue Chip.

Following the closing of the asset purchase agreement on May 2, 2003, a disagreement arose among the company's stockholders and directors over these two crucial factors in calculating the Makewell amount. First, despite the fact that approximately 85% of the company's assets had been sold and proceeds received on May 2, 2003, RDV and its director designees proposed a liquidation date of May 2004. According to the amended complaint, this one-year delay would have had the effect of increasing the Makewell amount substantially. This dispute was resolved when the company's outside counsel, Varnum, Riddering, Schmidt & Howlett, LLP, who was also then serving as outside counsel for RDV, advised the board that the liquidation event as defined in the certificate had in fact occurred on May 2, 2003.

Second, the contending factions disputed the amount of the net distributable assets within the meaning of the certificate of incorporation. The focus of this dispute was, and is, the appropriate treatment of the $20 million indemnification obligation under the asset sale agreement. Varnum opined that the net distributable assets "would have to be free of any liens or encumbrances, and that the company would have to be under no restrictions on their transfer. In addition, the board of directors would have to approve such dis-

tribution." [8] Based on this advice, the defendant directors created a reserve equal to $20 million, the maximum exposure under the asset purchase agreement's indemnity clause, and determined to exclude this entire amount from the calculation of the Makewell amount. As a result, although HCS had approximately $62 million in cash, based on this $20 million reserve the defendant directors calculated the net distributable assets at $42 million. The exclusion of this $20 million reserve from the Makewell amount calculation allegedly increased that payment from $741,000 to $2.6 million. At a July 28, 2003 board meeting, Tubergen, Damstra, Campbell and Petty approved a Makewell amount of $2.6 million over the opposition of the three other directors, Timothy Patton, John Wyant, and Michael J. Finn, using a liquidation date of May 2, 2003 and a net distributable asset valuation of $42 million.[9]

The defendant directors, allegedly controlled and dominated by RDV, approved the $42 million net distributable asset valuation in a "transparent scheme to maximize the Makewell amount paid to the Class H stockholders (RDV and Enterprise), to the detriment of the holders of other classes of preferred stock, including Blue Chip." [10] The amended complaint alleges that Patton, the company's founder and long-term president, told the board that a $20 million reserve is excessive and has no rational basis in the company's history or in the history of the industry.[11] Despite this information, the four director defendants allegedly unreasonably rejected without explanation several proposals by the stockholders and the other three di-

---

8. Compl. § 40.

9. This Makewell amount has been paid to the Class H preferred stockholders.

10. Compl. § 46.

11. Compl. § 43. Allegedly, the "aggregate third-party claims against the company in its 13–year history did not exceed $1 million."

rectors to determine the Makewell amount in a manner consistent with the eventual determination of actual liabilities incurred by the company. Moreover, they allegedly took the position that, even if the $20 million reserve proved to be excessive—as turned out to be the case—none of the $2.6 million Makewell amount would be returned to the company or redistributed to the other stockholders.

HCS has, to date, distributed approximately $55 million in cash to its stockholders. Moreover, the amended complaint alleges that the company expects to distribute "not less than an additional $7 million in the future." [12] Nevertheless, the defendant directors have rebuffed proposals to adjust the Makewell amount to compensate HCS's other stockholders for the allegedly excessive reserve created to reflect the contingent $20 million indemnity obligation.

## C. The Legal Challenge

On September 7, 2005, Blue Chip filed a derivative action alleging waste and breaches of fiduciary duties by the defendant directors of the company. It did not make a pre-suit demand but alleged demand excusal, arguing that a majority of the board lacked independence or were interested in the transaction. On December 9, 2005, the defendant directors and the company as a nominal defendant filed a motion to dismiss the complaint for failure to make a pre-suit demand on the company's board of directors and for failure to state a claim for breach of fiduciary duty against the directors.

In response, Blue Chip amended its complaint on January 13, 2006, asserting both a derivative action for breach of fiduciary duty, self-dealing, and waste against the individual defendant directors, and a

direct action against the company for breach of contract and breach of the implied duty of good faith and fair dealing. The amended complaint also asserts a direct claim for breach of fiduciary duty against the individual defendant directors. The amended complaint is in five counts: (1) Count I, for a declaratory judgment on the amount of net distributable assets as specified in the certificate; (2) Count II, for breach of fiduciary duty; (3) Count III, for waste; (4) Count IV, for breach of contract; and (5) Count V, for breach of the covenant of good faith and fair dealing.

## D. The Motions To Dismiss

On January 27, 2006, the defendant directors moved to dismiss this action pursuant to Court of Chancery Rules 23.1 and 12(b)(6). The defendants argue that Blue Chip's claim is derivative in nature and that it failed to make a pre-suit demand upon the board or properly to plead with particularity why demand should be excused. Furthermore, the defendants claim that this action is merely a matter of contract interpretation in that Blue Chip is challenging the board's calculation and determination of the Makewell amount as required in the certificate, and therefore does not state a claim for breach of fiduciary duty.

HCS also moved to dismiss the breach of fiduciary duty and waste claims in the first amended complaint because those claims were not directed at the company. The company moved to dismiss the remaining counts of declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing for failing to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). It argues that the certificate and Section 281(b)(i) of the Delaware General

12. Compl. § 56.

Corporation Law permitted it to exclude the full $20 million from the calculation of net distributable assets. Therefore, HCS contends that it fulfilled its contractual obligations as a matter of law. Oral argument was held on these motions on June 8, 2006.

## II.

The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[13] That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well pleaded allegations of fact in the complaint.[14] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[15] However, with that said, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences.[16]

## III.

A. *Fiduciary Duty Claims Against The Defendant Directors*

This case involves a disagreement over the proper distribution of the sale proceeds among the different classes of preferred stock as determined by the company's certificate of incorporation. Blue Chip does not challenge the underlying asset sale transaction and does not dispute the $20 million indemnity provision or any of the terms in the asset purchase agreement. Rather, it alleges that the four defendant directors breached their fiduciary duties and that HCS breached the certificate of incorporation and the implied covenant of good faith and fair dealing by calculating a Makewell amount that resulted in an alleged overpayment to the Class H preferred stockholders and an underpayment to the other preferred stockholders, such as Blue Chip.

The director defendants argue that the complaint cannot, as a matter of law, assert both contractual claims and fiduciary duty claims for the same alleged conduct and wrongdoing. They argue that the complaint raises nothing more than a contract dispute against the company over the terms of the Class H preferred stockholders' preference provision in the certificate. Therefore, the director defendants move under Rule 12(b)(6) to dismiss the fiduciary duty claims against them.

In *Gale v. Bershad*, the plaintiff alleged, as in this case, that the defendants breached both contractual and fiduciary duties owed to the preferred stockholders.[17] The plaintiff there brought suit against the company and its three directors for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty for allegedly redeeming the preferred stock at an unreasonably low and unfair price in violation of the certificate of incorporation. The court determined that (1) the same facts that underlie

**13.** *Kohls v. Kenetech Corp.*, 791 A.2d 763, 767 (Del.Ch.2000).

**14.** *Grobow v. Perot*, 539 A.2d 180, 188 n. 6 (Del.1988).

**15.** *Id.*

**16.** *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del.Ch.1999).

**17.** 1998 WL 118022 *1, 1998 Del.Ch. LEXIS 37 *1–2 (Del.Ch. Mar. 3, 1998).

the plaintiff's implied contract claim also form the basis of his fiduciary duty claim, and that (2) the duty sought to be enforced arose out of the parties' contractual, as opposed to their fiduciary, relationship.[18] Therefore, it held that "because the contract claim addresses the alleged wrongdoing by the board, any fiduciary duty claim arising out of the same conduct is superfluous." [19]

The court explained that the implied covenant of good faith and fair dealing defines the duties of parties to a contract and is analogous to the role of fiduciary law in defining the duties owed by fiduciaries.[20] However, the implied covenant specifically functions to protect preferred stockholders' expectations that the company and the board will properly perform the contractual obligations under the certificate. As a result, the court held, "to allow a fiduciary duty claim to coexist in parallel with an implied contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving the essentially contractual rights and obligations of preferred stockholders." [21] Therefore, it dismissed the plaintiff's fiduciary duty claims.

Similarly, in *Madison Realty Co. v. AG ISA, LLC*, this court, applying *Bershad*, held that the plaintiffs could not prosecute a claim for breach of fiduciary duty that essentially restated their claim for breach of contract.[22] It determined that the contract claims and fiduciary duty claims overlapped completely since the complaint asserted identical conduct as the basis for both legal claims. The court held that, because the dispute related to obligations expressly governed by contract, the fiduciary claims must be dismissed.[23]

■ Here, the complaint asserts contractual and fiduciary claims that arise from the same alleged facts and underlying conduct. Just like in *Bershad*, the fiduciary claim that the board breached its duty of loyalty when it improperly interpreted the Makewell provision is substantially the same as the implied contract claim that the board failed to determine the Makewell amount in good faith. Therefore, if the dispute relates to rights and obligations expressly provided by contract, the fiduciary duty claims would be "superfluous." [24]

Blue Chip contends that the dispute relates to the rights and obligations governed by both contract principles and fiduciary law. On one hand, Blue Chip argues that HCS failed to pay it the amounts to which it was entitled as a preferred stockholder under the certificate and that HCS breached the implied covenant of good faith and fair dealing by misinterpreting the certificate's Makewell provision. On the other hand, Blue Chip argues that it has sufficiently alleged a claim for breach of fiduciary duty against the defendant directors based on their self-interested decision to improperly favor the Class H

18. *Id.* at *5, 1998 Del.Ch. LEXIS 37 at *19–20 (finding that the fiduciary claim was substantially identical to the implied contract claim).

19. *Id.* at *5, 1998 DEl.Ch. LEXIS 37 at *22.

20. *Id.* at *5, 1998 DEl.Ch. LEXIS 37 at *21.

21. *Id.* at *5, 1998 DEl.Ch. LEXIS 37 at *22.

22. 2001 WL 406268 *6, 2001 Del.Ch. LEXIS 37 *19–20 (Del.Ch. Apr. 17, 2001).

23. *Id; see also HB Korenvaes v. Marriot Corp.,* 1993 WL 205040, *6–7, 1993 Del.Ch. LEXIS 90, *18–21 (Del.Ch. June 9, 1993) (dismissing the fiduciary claims and holding that the preferred stockholders' claims must be evaluated under the contractual law governing the special rights and preferences of the preferred).

24. *Bershad,* 1998 WL 118022 at *5, 1998 Del. Ch. LEXIS 37 at *22.

preferred stockholders over the other preferred stockholders. It claims that the rights and obligations implicated do not arise solely by reason of the charter, and may be remedied by means of a direct fiduciary claim against the individual defendants.

Blue Chip's claimed right as a preferred stockholder to a larger distribution of the proceeds arises from contractual rights and obligations under the certificate of incorporation—a binding contract between the company and its preferred stockholders.[25] The gravamen of the complaint is that the board improperly interpreted the Makewell provision in the certificate and overpaid the Class H preferred stockholders. Therefore, the claim is for breach of contract and for breach of the implied covenant of good faith and fair dealing, for which the remedy would be the difference in value between the board's alleged improper calculation of the Makewell amount and the value determined by this court.[26] Accordingly, the court concludes that contract, and not fiduciary, principles should govern the analysis and dismisses the fiduciary duty claims against the directors. In this connection, the court affirmatively notes the company's reassurance at oral argument that it has enough money to distribute to Blue Chip and the other preferred stockholders if the court rules in their favor to allow for a full remedy.[27] To prevent injustice should the corporate assets prove inadequate, the dismissal of the fiduciary duty claims will be without prejudice at this time, subject to possible modification upon entry of a final order.

## B. Breach Of Contract Claims

■ HCS contends that the contract claims against it should be dismissed as a matter of law because it correctly determined the amount of net distributable assets under the unambiguous certificate provision when its board created a dollar-for-dollar reserve against the contingent $20 million indemnification obligation in the asset sale agreement. Section 2.214 of the certificate defines "net distributable assets" as:

> The net assets of the company available for distribution to the company's shareholders upon the liquidation, dissolution or winding up of the affairs of the company, whether voluntary or involuntary, after payment or provision for payment,

**25.** See Rothschild Inter'l Corp. v. Liggett Group, Inc., 474 A.2d 133, 136 (1984) (holding that "preferential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation"); see Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 594 (Del.Ch.1986) which held that:

> With respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract; where however the right asserted is not to a preference as against the common stock but rather a right shared equally with the common, the existence of such right and the scope of the correlative duty may be measured by equitable as well as legal standards.

**26.** See Bershad, 1998 WL 118022 at *5, 1998 Del.Ch. LEXIS 37 at *20–21; see also HB Korenvaes, 1993 WL 205040 at *5, 1993 Del. Ch. LEXIS 90 at *14–17 (explaining that "to a very large extent, to ask what are the rights of the preferred stock is to ask what are the rights and obligations created contractually by the certificate of designation" and holding that in most instances "this contractual level of analysis will exhaust the judicial review of corporate action challenged as a wrong to the preferred stock").

**27.** However, if the company does not have sufficient funds to distribute to Blue Chip and the other preferred stockholders, Blue Chip may seek recovery by asserting breach of contract claims against the individual defendant directors.

of all of the debts and liabilities of the company.

HCS reads this provision in light of Section 281(b)(i) of the Delaware General Corporation Law.[28] Generally, Section 281(b) prescribes a statutory scheme for distributing assets of a dissolved corporation that has not elected to comply with the procedures of Sections 280 and 281(a).[29] Section 281(b)(i) requires that a dissolved corporation "pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional, or unmatured contractual claims known to the corporation or such successor entity." [30]

HCS argues that the $20 million indemnity obligation under the asset sale agreement is a known contingent contractual liability. Therefore, it contends that it was permitted by Section 281(b)(i) to reserve the full $20 million amount from its distributable assets. According to HCS, "the director defendants conservatively reserved the full $20 million contingent claim, thereby satisfying their obligations as a matter of law and removing their funding decision from the independent judgment of the court." [31] Effectively, HCS claims, having satisfied its obligations to the creditors under Section 281(b)(i), it has necessarily satisfied its obligations to its preferred stockholders under the certificate of incorporation.

The court cannot reasonably conclude, at least at this stage of the proceedings, that the provisions made for creditor claims under Section 281(b)(i) satisfied the contractual rights of the preferred stockholders. While the certificate's definition of net distributable assets permits the company to exclude a "provision for payment, of all the debts and liabilities of the company," it does not necessarily follow that the parties meant for Section 281(b)(i) to determine this provision of payment. Indeed, it is possible that when the preferred stockholders negotiated this provision with HCS, they did not intend for Section 281(b)(i) to be integrated into the definition of net distributable assets. Thus, there is some ambiguity as to whether Section 2.214 of the certificate of incorporation is meant to track Section 281(b)(i).

More fundamentally, Section 281(b)(i) is designed to protect the valid interests of creditors of a dissolved company, and says nothing about the rights and interests of preferred stockholders.[32] The cases that have been brought under this section involve claimants challenging the adequacy of some reserve and requesting the court's independent review to protect their potential claims against the company.[33] This

---

28. 8 *Del. C.* § 281(b).

29. *Id.*

30. *Id.* Section 281(b) distinguishes between (i) present claims, including contingent contractual claims, (ii) claims against the corporation that are the subject of pending proceedings, and (iii) claims that have not arisen but are likely to arise within ten years after the date of dissolution.

31. HCS Opening Br. 10.

32. *In re RegO Co.*, 623 A.2d 92, 94, 97 (Del. Ch.1992) (holding that the purpose of Section 281(b) is to afford fair treatment to creditors of a dissolved corporation, while providing corporate directors with a mechanism that will both permit distributions on corporation dissolution, and avoid risk of liability to unknown claimants of the dissolved corporation).

33. *In re Delta Holdings, Inc.*, 2004 WL 1752857 *7–8, 2004 Del.Ch. LEXIS 104 *27–28 (Del.Ch. July 26, 2004) (former directors and officers of the company object to the plan of distribution on the ground that the plan does not make a reasonable provision under Section 281(b)(i) to cover their claims under the insolvent company's indemnification provision); *Boesky v. CX Partners, L.P.*, 1988 WL 42250, 1988 Del.Ch. LEXIS 60 (Del.Ch. Apr. 28, 1988) (former partners, creditors, and potential creditors object to the plan of distribution, arguing that the plan

court has never applied this section to protect the company's decision to reserve the full dollar-for-dollar amount of a contingent liability which has the effect of favoring a single class of preferred stockholders. Stated differently, the fact that Section 281(b)(i) permits the board to create a dollar-for-dollar reserve does not speak to the allocation issues among preferred stockholders when the creation of such a generous reserve advantages one class over another.

To the extent that Section 281(b)(i) applies, it requires the company to make a "reasonable" provision for payment of all known contingent claims. Reserving dollar-for-dollar up to the maximum amount of contingent liability is not necessarily reasonable. In *In Re Delta Holdings, Inc.*, this court rejected the notion that the company had to set aside an amount to cover all potential contingent claims under Section 281(b)(i).[34] Instead, the court held that "one can foresee many cases where the likelihood of a triggering event at the time of distribution approaches zero, leading to the logical conclusion that no provision for future … claims is reasonable."[35]

Here, the complaint alleges that the $20 million, dollar-for-dollar, reserve bore no rational relation to HCS's past claims history or that of the industry. Allegedly, HCS's founder and president informed the board that the aggregate third-party claims against the company in its 13-year history did not exceed $1 million. Moreover, the complaint alleges that the board did not take into account that RDV was jointly and severally liable for any indemnification liability of HCS to Lincare. Nor did the board consider the possibility of a cross-indemnification agreement among HCS, RDV, Enterprise, Blue Chip, and others to remedy any inequity that might result from the payment of any claim arising subsequent to the final distribution of the company's assets. Therefore, taking Blue Chip's allegations as true, the court cannot determine, as a matter of law, that HCS properly decided to reserve the full $20 million in calculating the Makewell amount, especially where this decision resulted in a much larger distribution of the proceeds to the class of the preferred stock held by the controller.[36]

## IV.

For the foregoing reasons, the director defendants' motion to dismiss with respect to Counts II and III of the complaint is GRANTED and the claims against them dismissed without prejudice. HCS's mo-

does not adequately provide for their claims against the partnership).

**34.** 2004 WL 1752857 at *9, 2004 Del.Ch. LEXIS 104 at *36.

**35.** *Id.* at *7, 2004 Del.Ch. LEXIS 104 at *27–29 (holding that the court must discount the amount required to reasonably provide for the contingent claims by the likelihood of such underlying claims arising).

**36.** HCS cites to a second definition of "net distributable assets" set forth in Section 2.2.14(2) of the certificate of incorporation in support of its argument. That definition provides:

In the case of a merger or consolidation of the Company, with or into another corporation, or the sale of all or substantially all of the company's properties and assets or capital stock to any other person or persons, an amount equal to the net proceeds (whether in cash or property), available to the shareholders from such transaction.

The court's analysis applies to this definition as well. The court cannot reasonably conclude from this contract language whether the full $20 million should be excluded from the determination of net distributable assets. It is possible to interpret "property" to include the future interest in the reserve. Thus, it can reasonably be interpreted to require HCS to value the contingent indemnity obligation as a property interest in itself, rather than making the full dollar-for-dollar amount not "available" for distribution.

tion to dismiss Counts I, IV, and V is DENIED. IT IS SO ORDERED.