**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| IN RE ALTABA, INC. | ) ) ) | C.A. No. 2020-0413-JTL |

**OPINION**

Date Submitted: July 20, 2021
Date Decided: October 8, 2021

Paul J. Lockwood, Arthur R. Bookout, Matthew P. Majarian, Kathryn S. Bartolacci, Gregory P. Ranzini, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Petitioner Altaba, Inc.*

Michael A. Pittenger, Berton W. Ashman, Jr., David A. Seal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Adam M. Gogolak, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Claimants Verizon Communications Inc. and Oath Holdings Inc.*

**LASTER, V.C.**

Petitioner Altaba, Inc. (the "Company") is a dissolved Delaware corporation. Until 2017, the Company was known as Yahoo! Inc., and operated a once pioneering and still familiar internet-based business. Between 2012 and 2016, hackers victimized the Company repeatedly, resulting in massive data breaches.

In 2016, the Company agreed to sell its operating business to Verizon Communications Inc. After executing a sale agreement, the Company publicly disclosed the data breaches. The disclosures predictably resulted in litigation across multiple jurisdictions. Pertinent to this decision, the Company's customers filed a series of putative consumer-oriented class actions (the "National Customer Class Actions").

After the Company's disclosures, Verizon and the Company renegotiated the terms of their transaction. Under an amendment to their agreement, the Company committed to indemnify Verizon for 50% of any liability resulting from the National Customer Class Actions.

The parties to the National Customer Class Actions subsequently reached a global settlement. It has numerous components, including avenues for customers to obtain credit monitoring services and to receive compensation for time lost and expenses incurred due to the data breaches. The defendants agreed to fund the settlement with a total of $117.5 million. The Company and Verizon each bore 50% of the financial responsibility.

A federal district court approved the settlement as fair and reasonable to the class. With approved in hand, both the Company and Verizon funded their portions.

Two objectors filed appeals from the district court's decision. The court of appeals has not yet ruled, but it has rejected two motions for summary affirmance. The Company

and Verizon contend that the appeals are without merit. Both as a matter of general experience with appeals from settlements, and based on the particulars of the case, it seems highly likely that the district court's decision will be affirmed. That outcome, however, is not assured.

Meanwhile, in October 2019, the Company dissolved. Sections 280 and 281(a) of the Delaware General Corporation Law (the "DGCL") establish an optional, court-supervised process that a corporation can follow to wind up its affairs. The Company chose that path.

Under the elective path, the dissolved corporation must offer the holder of a contingent, conditional, or unmatured contractual claim an amount and form of security that will be sufficient to satisfy the claim if it matures. If the claimant rejects the corporation's offer, then the corporation may petition the Court of Chancery to determine the amount and form of security. The statute contemplates a litigated proceeding between the corporation and the claimant, governed by the rules of the court, that culminates in a trial. Based on the evidence presented, the court makes a factual determination regarding the requisite amount and form of security.

Verizon possesses a contingent contractual claim to indemnification from the Company for 50% of the liabilities associated with the National Customer Class Actions. The Company proposed an amount of security that Verizon rejected. This proceeding followed.

The Company maintains that no security is required for Verizon's indemnification claim beyond the $58.75 million that the Company has paid to fund its share of the

2

settlement. The Company explains that if the court of appeals affirms the district court's decision—undoubtedly the odds-on result—then Verizon will not have a claim for indemnification against the Company.

In response, Verizon cites the risks posed if the claim matures because the court of appeals reverses the district court's decision. Although unlikely, that event would generate considerable uncertainty regarding the future course of the National Customer Class Actions. The parties might reach a new settlement, potentially with the defendants paying more. Or the case could go to trial. If this court approved the Company's proposal regarding security, then the Company's exposure would be capped at $58.75 million. If the parties agreed to a higher-valued settlement, then Verizon would bear all of the increased cost. If the case went to trial, then Verizon would bear all of the excess liability.

Verizon maintains that Delaware's dissolution statute does not permit a dissolved corporation to shift risks of this sort to the holder of a contingent contractual claim. To provide sufficient security if its claim for indemnification matures, Verizon requests $400 million, inclusive of the $58.75 million that the Company already has paid.

Under the statute, the Company bore the burden of proving that its proposed amount and form of security will be sufficient to satisfy Verizon's claim for indemnification if it matures. There are known scenarios in which the claim will mature and the Company's proposal will prove inadequate. The Company therefore failed to carry its burden.

The next question is how much security to require. The Company has proposed an inadequate amount that the court has rejected. Verizon has proposed an amount that accounts for known risks, and which falls within a range of reasonableness, but which will

3

prove excessive unless low probability events arise. Although the court might have approved a different amount on a different record, the court adopts Verizon's proposal.

The policies governing the winding up of a corporation support this outcome. As a creditor, Verizon has priority over the Company's stockholders, who are the residual claimants. The Company seeks to establish a lower amount of security so that it can make a near-term distribution to its stockholders that includes an additional $341,250,000. Making that distribution would expose Verizon to known risks. As between a contingent contractual creditor and the equity holders, the statute requires that uncertainties be resolved in favor of the creditor.

There also is no reason for this court to facilitate a near-term distribution that would impose those risks on a creditor. By default, Delaware law contemplates a three-year winding up process, with automatic extensions for claims validly in litigation. The Company started its winding up process in October 2019. The default three-year period will not run until October 2022. Although it is impossible to predict when the court of appeals will rule, it seems likely that a decision will arrive before the end of the three-year period. If, as expected, the court of appeals affirms the district court's decision, then the Company no longer will need to retain any security for its indemnification obligation relating to the National Customer Class Actions.

Erring on the side of the contingent contractual creditor also helps prevent the opportunistic use of the elective path. The General Assembly enacted Sections 280 and 281 to address long-tail liabilities, such as product liability suits and mass torts claims, where liabilities may not emerge until years after the completion of a normal winding up process.

4

Liabilities of that type typically involve large numbers of claimants, and experts can use statistical techniques to determine an amount of security with confidence. There is no indication that the General Assembly intended for the Court of Chancery to get into the business of handicapping the outcome of one-off cases in other jurisdictions. That exercise is dangerous, because establishing an amount of security caps the amount that the plaintiff can recover. As a result, when the Court of Chancery engages in the act of setting security, it does more than merely predict the outcome of litigation pending before a sister court. This court's determination necessarily affects the course of the litigation before a sister court. Principles of comity counsel against that result.

There may be times when setting an amount of security that caps a claimant's recovery in a case pending in another jurisdiction would be warranted to facilitate the winding up of a Delaware corporation. Not here. The court therefore adopts Verizon's proposal for the amount of security required for its indemnification claim relating to the National Customer Class Actions. The Company will retain a total of $400 million as security earmarked for that claim, inclusive of the $58.75 million that the Company already has paid to fund its share of the settlement.

## I. FACTUAL BACKGROUND

The court conducted a three-day trial to receive evidence regarding the appropriate form and amount of security that the Company would post for several specific claims plus other broad categories of clams. During the course of the trial, the Company and the claimants introduced 990 exhibits into evidence, including twenty-seven deposition

transcripts. Four fact witnesses and seven experts testified live. In the pre-trial order, the parties agreed to 264 stipulations of fact.

Only a portion of the record concerned Verizon's claim for indemnification relating to the National Customer Class Actions. The Company and Verizon helpfully agreed to an additional eighty-five stipulations of fact relating to their disputes. Only three witnesses testified regarding the National Customer Class Actions: one fact witness from Verizon, and two dueling law professors who appeared as experts. The record supported the following findings of fact based on a preponderance of the evidence.[1]

## A. The Company Agrees To Sell Its Operating Business To Verizon.

Under a stock purchase agreement dated July 23, 2016, the Company agreed to sell its operating business to Verizon. JX 7. To facilitate the sale, the Company concurrently entered into an agreement under which the Company transferred the assets associated with its operating business to a newly formed, wholly owned subsidiary, subsequently known as Oath Holdings Inc. *See* JX 6 (the "Reorganization Agreement" or "RA"). Under the stock purchase agreement, Verizon agreed to acquire all of the stock of Oath Holdings.

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 241. Citations in the form "Stip. ¶ —" refer to additional stipulated facts relating to the claim for indemnification relating to the National Customer Class Actions. *See id.* Ex. A. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

The Reorganization Agreement identified the "Assumed Liabilities" that Oath Holdings would take on and the "Retained Liabilities" that would stay with the Company. *Id.* §§ 1.3, 1.4. Generally speaking, the Reorganization Agreement sought to separate the liabilities associated with the operating business from the Company's other liabilities, allocate the former to Oath Holdings, and keep the latter with the Company. To reinforce that allocation, the Reorganization Agreement created reciprocal indemnification obligations: Oath Holdings agreed to indemnify the Company for the Assumed Liabilities, and the Company agreed to indemnify Oath Holdings for the Retained Liabilities. *Id.* §§ 7.2(a), 7.3(a).

## B.    The Data Breaches

Between 2012 and 2016, hackers repeatedly obtained unauthorized access to the Company's customer database. Stip. ¶¶ 1–2. In September 2016, the Company issued a misleading partial disclosure about the data breaches which stated that the hackers had stolen customers' account information beginning "in late 2014." JX 834 at 3. The Company announced that the stolen account information "may have included names, email addresses, telephone numbers, dates of birth, hashed passwords . . . and, in some cases, encrypted or unencrypted security questions and answers." *Id.* at 6; JX 835 at 1. In November 2016, the Company announced that additional data breaches occurred in 2015 and 2016. Stip. ¶ 1. In December 2016, the Company disclosed yet another data breach that occurred in 2013. *Id.* The Company described the 2013 breach as affecting one billion customer accounts; a more accurate figure was three billion customer accounts. *In re Yahoo! Inc. Customer Data Sec.*

7

*Breach Litig.* (*Preliminary Approval Decision*), 2019 WL 387322, at *2 (N.D. Cal. Jan. 30, 2019). The Company did not disclose the data breach that took place in 2012.

The announcements predictably generated a range of lawsuits in multiple jurisdictions. Pertinent to the current decision, customers filed putative class actions against the Company. Stip. ¶ 2.

In December 2016, the Judicial Panel on Multidistrict Litigation consolidated the putative customer class actions that various plaintiffs had filed in federal court (the "Federal Litigation"). The panel transferred the consolidated Federal Litigation to the United States District Court for the Northern District of California (the "District Court") for pre-trial proceedings before Judge Lucy H. Koh. Stip. ¶¶ 18–19; JX 837. Other putative customer class actions proceeded in California state court (the "State Litigation").

## C.     The Indemnification Obligation

After the Company's announcements regarding the data breaches, Verizon and the Company renegotiated the terms of the stock purchase agreement. In February 2017, they agreed to a $350 million reduction in the purchase price, and Verizon agreed not to consider the data breaches when determining whether the Company had satisfied certain closing conditions, including whether the operating business had suffered a material adverse effect. JX 10 § 3; JX 841 at 5.

The Company and Verizon also agreed on amendments to the Reorganization Agreement. The upshot was that the Company and Oath Holdings each would be responsible for 50% of all "User Security Liabilities" that arose after the closing of the sale. *See* JX 9 § 3(a); Stip. ¶ 11. The amendment defined "User Security Liabilities" as

8

(i) any damages, fines, penalties, judgments, settlements or other similar amounts payable in cash to the extent resulting from, arising out of or imposed under or pursuant to any Third Party Actions in connection with any User Security Matters or any other Data Breaches[,] and

(ii) any damages, fines, judgments, settlements, penalties or other similar amounts payable in cash imposed by (including under or pursuant to any agreement or settlement with) any Governmental Authority, including U.S. state attorneys general and international data protection authorities, to the extent resulting from, arising out of or relating to any User Security Matters or any other Data Breaches, . . .

including attorneys', consultants' and other professionals' fees and expenses incurred in the investigation, defense or resolution of any such matters or liabilities; provided that User Security Liabilities shall not include any such damages, fines, penalties, judgments, settlements or other similar amounts (or the fees and expenses associated therewith) to the extent attributable to the failure by any Company Indemnitee to comply after the Closing with any agreement assumed by it or Governmental Order applicable to it or to the Business.

JX 9 § 3(a) (formatting added). To the extent either the Company or Oath Holdings paid more than its share of the User Security Liabilities, that party was entitled to indemnification from the other. Oath Holdings thus had a contractual right to indemnification from the Company to the extent Oath Holdings paid more than its 50% share. Stip. ¶ 11; JX 9 §§ 3(a), 3(d), 3(f); *see* JX 841 at 5.

The sale of Oath Holdings to Verizon closed in June 2017. Stip. ¶ 14. As the new owner of Oath Holdings, Verizon benefitted indirectly from the Company's indemnification obligation to Oath Holdings. Although the indemnification obligation ran directly to Oath Holdings, this decision follows the parties' lead and refers to Verizon as holding the indemnification obligation.

**D.      Litigation Over The Data Breach Claims**

In the United States, the customer litigation based on the data breaches proceeded primarily in the District Court. The Company moved to dismiss the plaintiffs' claims, but in August 2017, the District Court denied that motion in part. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *2 (N.D. Cal. Aug. 30, 2017).

The claims that the District Court permitted to proceed included claims under the California Unfair Competition Law, a claim under the California Customer Records Act, a claim for breach of the privacy policy in the Yahoo Terms of Service, a claim for breach of an implied contract based on the privacy policy and Terms of Service, and a claim for breach of the implied covenant of good faith and fair dealing. *Id.* at *53. As to the dismissed claims, the District Court for the most part granted the plaintiffs leave to replead. *Id.*

In October 2017, Verizon disclosed that the 2013 data breach affected approximately three billion customer accounts, rather than the one billion customer accounts that the Company originally disclosed. The more accurate figure meant that the 2013 data breach had affected every customer account then in existence at the Company. *Preliminary Approval Decision*, 2019 WL 387322, at *2. The District Court granted the plaintiffs leave to amend their complaint in light of the new facts. *See In re Yahoo! Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, ECF No. 155 at 10 (N.D. Cal. Oct. 13, 2017) (TRANSCRIPT).

While the Federal Litigation moved forward, the Company reached agreements to settle other litigation resulting from the data breaches. In April 2018, the Company settled with the Securities and Exchange Commission and agreed to pay a penalty of $35 million.

10

Press Release, Sec. & Exch. Comm'n, Altaba, Formerly Known as Yahoo!, Charged with Failing to Disclose Massive Cybersecurity Breach; Agrees to Pay $35 Million (Apr. 24, 2018), *available at* http://www.sec.gov/news/press-release/2018-71. In September 2018, the Company agreed to pay $80 million to resolve a federal securities action. *In re Yahoo! Inc. Sec. Litig.*, 2018 WL 4283377 (N.D. Cal. Sept. 7, 2018) (ORDER). And the Company's former directors and officers agreed to pay $29 million to settle a derivative action in California state court. *In re Yahoo! Inc. S'holder Litig.*, No. 17-CV-307054 (Cal. Super. Ct. Jan. 9, 2019) (ORDER).

### E. The Settlement

In September 2018, the plaintiffs in the Federal Litigation informed the District Court that they had reached an agreement in principle to settle the Federal Litigation. The proposed settlement also would resolve the State Litigation.

When the parties asked the District Court to approve the settlement preliminarily so that they could provide notice to class members and proceed towards a fairness hearing, the District Court declined. *See Preliminary Approval Decision*, 2019 WL 387322, at *14. The District Court identified a number of problems with the form of the notice, as well as substantive problems with the settlement itself.

Among other things, the District Court found that the notice failed to disclose that the settlement would release claims arising out of the 2012 data breaches. The District Court explained that a release of those claims was substantively improper because the plaintiffs had not asserted any claims based on data breaches that occurred before 2013. *Id.* at *5–6. The District Court also found that the notice failed to provide adequate disclosure

11

regarding the size of the settlement fund, in part because the settlement contemplated that "any unawarded attorneys' fees may improperly revert to Defendants." *Id.* at \*7–8. The notice likewise failed "to adequately disclose the scope of non-monetary relief," where the Company had "made only vague commitments as to specific business practices to improve data security." *Id.* at \*11, \*13. And the notice contained "a misleading estimate of the size of the settlement class," which prevented the court from being able "to adequately assess whether the settlement is fair, reasonable, and adequate." *Id.* at \*12.

After the District Court's rejection of the settlement, the plaintiffs filed an amended complaint that included claims based on the 2012 data breach. Stip. ¶ 32; JX 13. The parties also reached agreement on the settlement that the District Court ultimately would approve (the "Settlement").

This time, the District Court granted preliminary approval and certified a class for purposes of issuing the notice and enabling class members to opt out of or object to the Settlement. Stip. ¶¶ 36–38. In response to the notice, 1,868 class members opted out, and thirty-one class members submitted objections. *Id.* ¶¶ 44–45.

## F. The Company Dissolves.

Meanwhile, in April 2019, the Company's board of directors approved a plan of dissolution. At a special meeting in June 2019, the Company's stockholders voted in favor of the plan. PTO ¶¶ 31, 33. When seeking stockholder approval, the Company estimated that it would be able to pay its creditors and make aggregate liquidating distributions of between $39.9 billion and $41.2 billion, or $76.82 to $79.32 per share. In September 2019,

the Company made a pre-dissolution distribution to its stockholders of $26.75 billion, or $51.50 per share. *Id.* ¶ 34.

On October 4, 2019, the Company filed a certificate of dissolution with the Secretary of State. The Company chose to wind up its affairs using the elective process authorized by Sections 280 and 281(a) of the DGCL.

In October 2019, in accordance with the steps contemplated by Section 280(a), the Company mailed a notice to Verizon stating that any claims Verizon possessed against the Company needed to be presented by December 11, 2019, or they would be barred. *See* JX 888.

By letter dated November 22, 2019, Verizon asserted claims based on the Company's obligations under the Reorganization Agreement. Those claims include a claim for indemnification related to the National Customer Class Actions. *See* JX 890.

By letter dated December 23, 2019, the Company informed Verizon that it accepted responsibility for 50% of the User Security Liabilities as defined in the Reorganization Agreement, which included the National Customer Class Actions. The Company offered security of $89.3 million to cover all of Verizon's claims, including but not limited to the claim for indemnification relating to the National Customer Class Actions. As contemplated by the elective process, the Company noted that (i) "[f]or all claims made under Section 280(b) of the DGCL, . . . you will be deemed to have accepted this offer of security as the sole source from which to satisfy your Claims unless a notice rejecting this offer of security is delivered to the Company in writing within 120 days"; and (ii) "[f]or any claims made under Section 280(a) of the DGCL, any claims that are rejected (in whole

13

or in part) will be barred if an action, suit or proceeding with respect to such Claims is not commenced within 120 days of the date of this letter." JX 897 at 2.

By letter dated March 18, 2020, Verizon rejected the Company's offer of security. Verizon demanded security of $3.63 billion for all of its claims. Included within that amount was a demand for $475 million for claims relating to "Yahoo Data Breaches," which included the National Customer Class Actions. PTO ¶ 93.

## G.     The District Court Approves The Settlement.

On July 22, 2020, the District Court approved the Settlement in a thoughtful and thorough opinion. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.* (*Settlement Decision*), 2020 WL 4212811 (N.D. Cal. July 22, 2020). Although the District Court identified a series of significant weaknesses in the Settlement, the District Court ultimately found the Settlement to be fair and reasonable.

As a backdrop to its assessment of the merits of the Settlement, the District Court considered that "the Settlement was reached after arm's length negotiations by capable counsel, aided by three experienced mediators, and was not a product of fraud, overreaching, or collusion among the parties." *Id.* at *9. The Settlement also was reached after meaningful discovery:

> Plaintiffs took seven depositions, and Plaintiffs also produced four different expert reports. Plaintiffs' four experts were deposed, and nine named plaintiffs . . . were deposed. The parties settled only after Plaintiffs . . . had filed a motion for class certification, and Defendants had filed an opposition, but before Plaintiffs filed a reply. . . . Both parties had therefore developed a perspective on the strengths and weaknesses of their respective cases in order to "make an informed decision about settlement."

*Id.* at \*13 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)). The District Court concluded that "[t]his discovery is indicative of a lack of collusion, as the parties have litigated the case in an adversarial manner." *Id.*

On the merits, the Settlement provided the class of 194 million members with benefits supported by a fund of $117.5 million. *Id.* at \*12. In evaluating the sufficiency of the benefits, the court compared the recovery to four precedent settlements that had received court approval:

- *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018) (79 million class members; settlement fund of $115 million);

- *In re The Home Depot, Inc. Customer Data Sec. Breach. Litig.*, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) (52 million class members; settlement fund of $28.4 million);

- *In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306 (D. Minn. Nov. 17, 2015) (110 million class members; settlement fund of $23.3 million); and

- *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) (147 million class members; settlement fund of $380.5 million), *aff'd in part, rev'd in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021).

The District Court found that compared to these precedents, the Settlement provided an "adequate recovery." *Settlement Decision*, 2020 WL 4212811, at \*10.

The fund of $117.5 million created by the Settlement translated into $0.61 per class member, which was lower than mean and median from the precedents. The District Court cited "numerous factors" that led the court to expect "a larger recovery for the Settlement Class than in other data breach cases." *Id.*

First, the Company had not suffered only a single data breach. It suffered multiple data breaches over a five-year period. *Id.*

15

Second, the number of affected customer accounts was much larger than in precedent settlements. And the District Court noted that in each of the precedent cases, the defendants had entered into a series of settlements with affected customers, resulting in the defendants paying "far more in total for single data breaches than what Yahoo will pay pursuant to this Settlement for multiple data breaches over a five-year period." *Id.* at *11.

Third, the District Court noted that the Company's "lack of transparency related to the data breaches" had been "egregious." *Id.* The Company knew about the breaches shortly after they occurred, so the Company could have disclosed the breaches and provided free credit monitoring services to affected users when it would have mattered most. Instead, the Company did nothing. As a result, the Company's "data was sold on the dark web." *Id.*

Fourth, the Company misled investors, resulting in settlements with the SEC and a class of stockholders. *Id.* The Company did not admit wrongdoing in either settlement, but it conceded that it had "'contemporaneous knowledge' of the 2014 data breach." *Id.* at *10 (quoting Yahoo! Inc., 2016 Annual Report (Form 10-K), at 47 (Mar. 1, 2017)).

The District Court conducted a detailed comparison of the Settlement with the *Anthem* precedent. *Id.* at *11. The Settlement would reimburse class members at a rate of $25 per hour for the time they spent responding to the data breaches, compared to $15 per hour in the *Anthem* settlement. *Id.* at *12. Class members could receive reimbursement for up to five hours of time without providing documentation, compared to a universal documentation requirement in the *Anthem* settlement. But unlike the *Anthem* settlement, the Settlement capped total reimbursement for lost time at $375 per class member, while

16

the *Anthem* settlement did not contain a cap. At the same time, the Settlement provided greater reimbursement for out-of-pocket costs, covering up to $25,000 per class member compared to the *Anthem* amount of $10,000 per class member. *Id.* And the Settlement provided free credit monitoring services to class members, albeit for a shorter period than the *Anthem* settlement. *Id.* at *11. Based on this detailed comparison, the District Court concluded that it "would have expected a larger settlement here than in *Anthem*." *Id.* at 12.

The District Court concluded that each of these factors weighed "in favor of a larger settlement in the instant case than in other data breach cases." *Id.* at *11. Other factors, however, indicated that the Settlement was reasonable. For example, most class members only suffered the loss of their email addresses, passwords, telephone numbers, birth dates, and security questions and answers. Comparatively fewer class members lost "more sensitive personal information, such as Social Security numbers, financial and bank records, and medical records." *Id.* Having completed its meticulous analysis, the District Court determined that the Settlement was fair and reasonable to the class. *Id.* at *13.

The District Court then turned to the objections. The most common objection related to the size of the Settlement. The District Court reiterated its conclusion that the Settlement was adequate. *Id.* at *13–17.

Several objectors asserted that the credit monitoring component lacked value because of concerns about AllClear ID, the credit monitoring vendor. *Id.* at *17. The District Court rejected this objection, noting that AllClear ID "supplies credit monitoring to 2,228,748 individuals around the world," has "an A+ rating from the Better Business Bureau," and "has consistently maintained a 96% customer satisfaction rating along with

17

100% success resolving financial identity theft cases." *Id.* (internal quotation marks omitted).

Finally, the District Court considered lead counsel's application for an award of attorney's fees. Plaintiffs' counsel sought an award of $29.375 million, representing 25% of the settlement fund. The District Court rejected that request, finding that it would confer a windfall. *Id.* at *24, *38. The court reiterated that the Settlement produced "a far lower per-capita recovery . . . than in comparable cases," which meant that the size of the fund largely resulted from the size of the class rather than the recovery that counsel obtained. *Id.* at *25. The District Court instead used the lodestar method, approved a lodestar of 1.15, and granted a fee of $22.764 million. *Id.* at *37.

As part of its analysis of fees and expenses, the District Court approved service awards for the named class representatives. *Id.* at *43. The District Court declined to approve fee awards or service awards for various objectors. *See id.* at *45; *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, ECF No. 507 (N.D. Cal. Aug. 11, 2020) (ORDER).

## H.     Two Objectors File Appeals.

Two objectors filed appeals with the United States Court of Appeals for the Ninth Circuit (the "Court of Appeals"). Stip. ¶ 48. Aaron Miller asserted that the District Court erred by approving AllClear ID as the vendor for credit monitoring services. JX 1173. James McCain asserted that the District Court erred by denying his application for an award of attorneys' fees, expenses, and a service award for the benefit he conferred as an objector. Stip. ¶ 51.

18

In September 2020, the plaintiff-appellants filed a motion for summary affirmance. *Id.* ¶ 52. In November 2020, the Court of Appeals denied the motion without prejudice and directed that briefing go forward. *Id.* ¶ 53.

In March 2021, Miller filed his opening brief on appeal. JX 1173. He argued that the District Court erred by failing to apply a "higher standard of fairness" that he contended governs when a court approves a settlement involving a settlement class. *Id.* at 6 (citing *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)). He contended that the District Court abused its discretion when it approved use of AllClear ID as the provider of credit monitoring services because the District Court failed to consider "over 100 complaints from consumers" against AllClear ID. *Id.* at 8. Miller also claimed that the District Court improperly relied "solely on the rating of the Better Business Bureau and a self-serving declaration of a corporate representative of AllClear ID." *Id.* And he challenged the District Court's award of attorneys' fees and expenses to plaintiffs' counsel. *Id.* at 9.

Also in March 2020, McCain filed his opening brief. He only challenged the District Court's denial of his separate application for an award of attorneys' fees, expenses, and a service award. *See* Appellant's Opening Br., *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 20-16779, ECF No. 23 (9th Cir. Mar. 12, 2021).

Shortly after Miller filed his appeal, the plaintiff-appellants renewed their motion for summary affirmance. Pls.-Appellees' Mot. for Summ. Affirmance, *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 20-16779, ECF No. 20 (9th Cir. Mar. 9, 2021). In June 2021, the Court of Appeals again denied the motion. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 20-16779, ECF No. 33 (9th Cir. June 8, 2021) (ORDER). This time,

19

the Court of Appeals explained that "the arguments raised in the opening briefs are sufficiently substantial to warrant further consideration by a merits panel." *Id.*

## I.     This Litigation

While these events unfolded, the Company moved forward with the elective, court-supervised winding up process. On May 28, 2020, the Company filed this proceeding, in which it sought to have the court determine the amount and form of security required for various claims, including Verizon's claim for indemnification relating to the National Customer Class Actions.

In August 2020, the Company petitioned the court for leave to make an interim distribution to stockholders. In connection with that motion, the Company proposed to hold back $58.75 million for the National Customer Class Actions, representing its share of the defendants' financial responsibility for the Settlement. At Verizon's request, the Company agreed to hold back an additional $364,750,000, solely for purposes of the interim distribution, to cover additional potential claims by Verizon relating to the Company's data breaches. *See* PTO ¶ 43.

After the issuance of the Settlement Decision, the Company and Verizon each paid $58.75 million to fund the Settlement. The Company's payment satisfied its then-present obligations regarding the National Customer Class Actions. After further discussions with Verizon, the Company nevertheless agreed to continue to hold back an additional $342,250,000, solely for purposes of the interim distribution, to cover additional potential claims by Verizon relating to the data breaches. That amount included Verizon's claim to indemnification based on the National Customer Class Actions. *See id.* ¶ 64.

20

The court authorized the Company to make an interim distribution of $4.33 billion, or $8.33 per share, that took into account the agreed-upon interim holdbacks. *See* JX 86. After the interim distribution, the Company and Verizon failed to reach agreement regarding an amount of security for Verizon's indemnification claim relating to the National Customer Class Actions. They accordingly conducted discovery and proceeded to trial on that issue.

## J.     The Status Of The Appeal

The objectors' appeal of the Settlement Decision remains pending. Briefing was completed on August 30, 2021.

## II.     LEGAL ANALYSIS

The Company sought to prove that the $58.75 million it paid to fund the Settlement constituted a form and amount of security that will be sufficient to satisfy Verizon's contingent, contractual claim to indemnification for the National Customer Class Actions. To inform that determination, this decision first reviews the applicable statutory framework, the policies it reflects, and the issues raised when setting an amount of security. This decision then turns to the applicable statutory standard, which prior decisions have not addressed explicitly. Finally, this decision applies that standard in light of the statutory framework, its underlying policies, and the risks inherent in setting an amount of security for a one-off claim. This decision holds that the Company failed to carry its burden of proof, and it adopts Verizon's proposed form and amount of security. The Company shall retain $400 million as security for Verizon's claim to indemnification for the National

21

Customer Class Actions, inclusive of the $58.75 million that the Company already has paid to fund the Settlement.

**A.      The Legal Backdrop**

Delaware's statutory structure for winding up the affairs of a dissolved corporation represents a legislative effort to balance the interests of creditors and stockholders. The current statutory structure includes the optional procedure that the Company has pursued, which gives a dissolved corporation the ability to obtain a judicial determination regarding the amount and form of security that it must provide for a creditor.

**1.      The Winding Up Process And The Absolute Priority Rule**

When a Delaware corporation dissolves, it enters a phase known as winding up. Using more complex language, the DGCL explains that the corporate existence of "[a]ll corporations" that have dissolved is

> continued, for the term of 3 years from such . . . dissolution or for such longer period as the Court of Chancery shall in its discretion direct . . . for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized.

8 *Del. C.* § 278.

As the statute makes plain, after the corporation has discharged its liabilities, the stockholders receive "any remaining assets." That is because stockholders are residual claimants. Hence they must stand at the back of the line, await the results of the winding up process, and receive what remains after creditors' claims have been paid.

Under this system, stockholders might wait a long time. The statute contemplates a default period of three years for winding up, and the Court of Chancery may extend that period "in its discretion." *Id.* Moreover, the statue provides that the winding up period shall continue for the purpose of litigating claims pending at the time of dissolution or commenced within the three-year period. In the complex language of the DGCL,

> [w]ith respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, . . . the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery.

*Id.* That provision ensures that creditors can litigate their claims to judgment and have the opportunity to recover from the corporation's assets, before the corporation makes a liquidating distribution to the stockholders of "any remaining assets."

The corporation's statutory obligation to use its assets to satisfy creditors before distributing "any remaining assets" to stockholders codified the absolute priority rule, which holds that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation." *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 116 (1939) (quoting *Kan. City. Terminal Ry. Co. v. Cent. Union Tr. Co. of New York*, 271 U.S. 445, 455 (1926)).[2]

---

[2] At common law, before its codification, the absolute priority rule manifested itself in the trust fund doctrine. Although the specifics of the doctrine varied across jurisdictions and remain subject to dispute, its core concepts were that "on dissolution corporate directors have obligations to creditors and that creditors, at least creditors of whom the corporation had reason to know, have an equitable right to follow corporate assets and to

The DGCL contains other provisions that reflect the codification of the absolute priority rule and are designed to prevent equity investors from receiving funds at the expense of creditors, such as limitations on mid-stream dividends and distributions to equity holders, as well as restrictions on redemptions of capital stock.[3] The Bankruptcy Code likewise contains provisions designed to codify the absolute priority rule,[4] and it

---

impress a constructive trust upon them in the hands of shareholders." *In re RegO Co.*, 623 A.2d 92, 95 (Del. Ch. 1992); *see* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 7369 & n.1 (perm. ed., rev. vol. 2021) (describing the trust fund doctrine and tracing its roots to Justice Story's 1824 opinion in *Wood v. Dummer*, 30 F. Cas. 435, No. 17944 (C.C.D. Me. 1824)); Rosemary Reger Schnall, Comment, *Extending Protection to Foreseeable Future Claimants Through Delaware's Innovative Corporate Dissolution Scheme—In re RegO Co.*, 19 Del. J. Corp. L. 141, 143–45 (1994) (discussing the history of the trust fund doctrine).

[3] *See* 8 *Del. C.* §§ 160(a), 170(a); *see SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 981–88 (Del. Ch. 2010) (discussing limitations on distributions and redemptions under the DGCL and the common law), *aff'd*, 37 A.3d 205 (Del. 2011); *see also Cont'l Invs. Fund LLC v. TradingScreen Inc.*, 2021 WL 3120860, at *17 (Del. Ch. July 23, 2021) ("Special considerations apply to mandatory redemption provisions because of the junior position that equity holders occupy in the capital structure. Both the DGCL and the common law impose restrictions on redemption rights that other contract claimants do not face.").

[4] The United States Bankruptcy Code implements the absolute priority rule for purposes of a liquidation under Chapter 7 by requiring payment to all claimants in priority over "the debtor," whose property remains available for distribution to equity holders. *See* 11 U.S.C. § 726(a). The Bankruptcy Code implements the absolute priority rule for purposes of a reorganization under Chapter 11 by providing that a reorganization plan generally can be confirmed only with the assent of each class of impaired creditors. *Id.* §§ 1126(c), 1129(a)(8). Under an exception to this rule, the court can confirm the reorganization plan if the other requirements for confirmation are met and the plan is "fair and equitable." *Id.* § 1129(b)(1). One of the requirements for a plan to be fair and equitable is that if an unsecured creditor is not paid in full, then "the holder of any claim or interest that is junior to the claims of [the unsecured creditor] class will not receive or retain under the plan on account of such junior claim or interest any property." *Id.* § 129(b)(2)(B)(ii). Congress enacted this version of the statutory absolute priority in 1978 as part of a massive

24

contains a specific restriction on the ability of an equity investor to jump the line by converting its equity-based claim into a judgment.[5]

For stockholders, the idea of waiting for a dissolved corporation to litigate and satisfy claims before receiving "any remaining assets" presented a decidedly unappetizing prospect. It also might not make economic sense. If a corporation had ample assets to pay off its creditors, including pending claims, then those creditors would not be harmed by an earlier distribution. Excess assets that could be used productively should not be tied up unnecessarily in the winding up process. Directors therefore might approve distributions of excess assets to stockholders, albeit at some personal risk. Historically, that risk "was not a cause of great concern because of the applicability of limitations periods and the

---

overhaul of United States bankruptcy law. *See* An Act to Establish a Uniform Law on the Subject of Bankruptcies, Pub. L. No. 95–598, 92 Stat. 2549 (1978). The statutory absolute priority rule was intended to codify the prevailing interpretation of the "fair and equitable" standard under previous bankruptcy statutes, under which a plan "may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all." *In re Coltex Loop Cent. Three P'rs, L.P.*, 138 F.3d 39, 43 (2d Cir. 1998) (emphasis omitted) (quoting 124 Cong. Rec. 32,408 (1978)). Thus, if an unsecured creditor receives less than the full value of its claim, then the court still may approve the plan so long as all classes of claimants junior to the unsecured creditor—namely the equity—receive nothing.

[5] *See* 11 U.S.C. § 510(b) (providing that if a stockholder has obtained a money judgment "for damages arising from the purchase or sale of . . . a security," such as for a redemption obligation, then that money judgment has a special, subordinated status, junior "to all claims or interests that are senior to or equal [to] the claim or interest represented by such security" that prevents the preferred stockholder from exercising the full rights that a true creditor would possess); *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002) (explaining policy underlying Section 510(b) of "prevent[ing] disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy").

25

relative ease of determining the existence and extent of such claims." 2 David A. Drexler

et al., *Delaware Corporation Law and Practice* § 38.05[5], at 38-16 (2019).

Developments outside of corporate law placed pressure on the extant system. "Over

time . . . , the scope of corporate liability expanded," particularly for product liability suits

and claims relating to mass torts, "and the protection provided by statutes of limitation

became less certain." *In re Altaba, Inc.*, 241 A.3d 768, 774 (Del. Ch. 2020). Those legal

developments increased the risk that substantial claims could materialize "years after the

completion of the liquidation of the corporation whose activities caused the claimed

injuries." Drexler, *supra*, § 38.05[5], at 38-16. Before 1987, however, the law governing

the winding up of a corporation left open the question of

> what, if any, rights are afforded to persons who have no claim against a
> corporation at the time of its dissolution, or during the statutory wind-up
> period, but who do thereafter acquire such a claim. Such a person might, for
> example, be a tort claimant who is injured by an arguably defective product
> some time after, perhaps years after, the corporation has been dissolved, and
> its affairs finally wound-up.

*RegO*, 623 A.2d at 96. Courts in other jurisdictions divided on whether such claimants

could pursue directors and stockholders of the dissolved corporation.[6]

---

[6] *See RegO*, 623 A.2d at 96 (discussing authority). *See generally* D. Gilbert Friedlander & P. Anthony Lannie, *Post-Dissolution Liabilities of Shareholders and Directors for Claims Against Dissolved Corporations*, 31 Vand. L. Rev. 1363, 1365 (1978) (citing "overwhelming inconsistency in the case law" addressing post-dissolution claims); Frederick Tung, *Taking Future Claims Seriously: Future Claims and Successor Liability in Bankruptcy*, 49 Case W. Res. L. Rev. 435, 439–41 (1999) (explaining that "[t]he proper treatment of future claims in bankruptcy is . . . an unsettled question among both courts and commentators").

Behind the legal questions were two significant and competing policy concerns.

First, the problem of compensation to persons injured by defective products or by undiscovered and actionable environmental injury, caused by dissolved corporations, is of obvious social concern. If, in the context of a corporate dissolution, the corporation law does not treat these possible contingencies responsibly, it can be expected that other legal doctrines, such as successor liability doctrines, will be stretched and shaped to address them.

*RegO*, 623 A.2d at 96. Second, because of the risk presented by long-dated liabilities, corporate directors might be unwilling to make distributions if they had reason to know that future claims were likely to arise. *See id.* Risk aversion could result in productive assets being tied up unnecessarily in a prolonged winding up process.

### 2. The Creation Of Two Paths

In 1987, the General Assembly responded to these competing concerns by adopting Sections 280, 281, and 282 of the DGCL. The new sections created alternative procedures for winding up the affairs of a dissolved corporation, each of which

recognizes rights in unknown future corporate claimants and provides a level of assurance to such persons that, as part of the corporate dissolution process, reasonable provision will be made for their future claims. Equally important, the new procedure offers to directors and shareholders (and perhaps transferees) assurance that, if the Court of Chancery approves security provisions for corporate claimants, then they will be protected from potential future claims arising from the decision to distribute the corporation's assets on dissolution.

*RegO*, 623 A.2d at 97.

The first procedure appears in Sections 280 and 281(a) of the DGCL and entails a court-supervised process that a dissolved corporation can choose to follow (the "Elective Path"). If a corporation does not choose the Elective Path, then it must follow the second procedure, found in Section 281(b) (the "Default Path"). *See* 3 Edward P. Welch et al.,

27

*Folk on the Delaware General Corporation Law* § 280.01, at 10-131 (6th ed. & Supp. 2016-2).

Taking the procedures in reverse order, the Default Path requires that the corporation adopt a plan of dissolution that establishes security for or makes other provision to satisfy different categories of claims. *See* 8 *Del. C.* § 281(b). The corporation might earmark claim-specific reserves for particular claims, establish general reserves for categories of claims, procure third-party insurance to cover potential claims, or make other arrangements. *See Boesky Corp. v. CX P'rs, L.P.*, 1988 WL 42250, at *16–17 (Del. Ch. Apr. 28, 1988) (describing types of security). Having established adequate amounts of security, the corporation can make a liquidating distribution to stockholders based on its net assets. *See* 8 *Del. C.* § 281(b).

If a corporation follows the Default Path, then claimants may challenge the plan of dissolution and seek to enjoin any distributions that it contemplates. *See, e.g.*, *Boesky*, 1988 WL 42250, at *17–18 (enjoining a proposed partial liquidating distribution under a plan of dissolution). More often, claimants who end up holding unsatisfied claims will attempt to recover from the directors personally on the theory that the directors failed to comply with the statute. Unsatisfied claimants also may seek to claw back the distributions that the stockholders had received. *See* Drexler, *supra*, §§ 38.05[5] & 38.05[7], at 38-24 to 24.1.

The more innovative dimension of the DGCL's scheme is the Elective Path, which establishes a mechanism that enables a dissolved corporation to obtain binding judicial determinations regarding the amount of security required *before* the corporation makes a liquidating distribution. Rather than having the sufficiency of the security potentially

28

decided long after the fact, with the benefit of hindsight, and at a time when subsequent events would have revealed the reserve to be inadequate, the question of sufficiency can be litigated up front.

In theory, both paths end up at the same point: "Compliance with either [the Elective Path or the Default Path] shields directors and shareholders of the dissolved corporation from post-dissolution liability to third party claimants."[7] In practice, however, the differing ability of claimants to challenge whether the corporation complied with the statutory requirements of the two paths results in different levels of risk. Compliance with the statutory standards under the Default Path "will, in principle at least, always be litigable."[8] Compliance with the Elective Path will be determined contemporaneously by a court. Directors and stockholders thus face a greater degree of residual risk under the Default Path

---

[7] *In re Krafft-Murphy Co.*, 82 A.3d 696, 706 (Del. 2013); *see* 8 *Del. C.* § 281(c) ("Directors of a dissolved corporation . . . which has complied with subsection (a) or (b) of this section shall not be personally liable to the claimants of the dissolved corporation"); *id.* § 282(a) (limiting liability of stockholders where a corporation has complied with either path to the lesser of the "stockholder's pro rata share of the claim or the amount so distributed to such stockholder").

[8] *RegO*, 623 A.2d at 97; *see* R. Franklin Balotti & Jesse A. Finkelstein, 1 *The Delaware Law of Corporations and Business Organizations* § 10.18 (4th ed. & Supp. 2021-2) (describing the Default Path as the "'short-form' dissolution process under Section 281(b)" and the Elective Path as the "'long-form' dissolution process under Section 280" and explaining that "the substantial protections afforded by the statutory scheme to directors and stockholders may not be available if the dissolved corporation does not follow [the Elective Path]"); Michael P. Dooley & Michael D. Goldman, *Some Comparisons Between the Model Business Corporation Act and the Delaware General Corporation Law*, 56 Bus. Law. 737, 764 (2001) ("Directors following the [Default Path] would be exposed to potential claims that they did not make 'adequate provision' for certain claims and that they should be held personally liable for the amount not received by the stockholders.").

than the Elective Path. *See Krafft-Murphy*, 82 A.3d at 701. Balanced against the Elective Path's greater certainty is its increased up-front cost.[9]

The Elective Path enables the corporation to force known claimants to accept or challenge the corporation's proposed amounts of security up front, while also enabling the corporation to obtain court-approved determinations regarding any disputed amounts. In summary, the Elective Path contemplates the following steps:

(i)    The dissolved corporation gives notice of the corporation's dissolution to all persons having claims against the corporation other than claims already in litigation. *See* 8 *Del. C.* § 280(a)(1).

(ii)    Claimants then must present their claims in writing before a specified date, no earlier than sixty days from the date of the corporation's notice, to preserve their claims. *See id.* § 280(a)(1)(c) & (a)(2).

(iii)    The dissolved corporation may reject any timely presented claim in whole or in part, at which point the rejected claim is lost if the claimant does not commence an action, suit, or proceeding with respect to the claim. *See id.* § 280(a)(3) & (a)(4).

---

[9] *See* Dooley & Goldman, *supra*, at 764 ("Because [the Elective Path] involves litigation that could drag on for some time, corporations tend not to avail themselves of this safe harbor, preferring to utilize devices such as liquidating trusts instead."); Lawrence A. Hamermesh & Donald J. Wolfe, *The Delaware Dissolution Statutes: A Case Study*, Del. Law., Fall 1994, at 22, 22–24 (explaining that the Default Path "enjoys the advantage of less litigation expense, at least at the outset," but that it creates "a variety of eminently litigable issues," while the Elective Path provides "additional protection" at an incrementally higher cost); Edward T. Pivin, Comment, *The Integrity of Delaware's Corporate Dissolution Statute After Territory of the United States v. Goldman, Sachs & Co.: Is Extended Post-Dissolution Shareholder Liability a Necessary Component of Delaware's Corporate Dissolution Scheme?*, 55 St. Louis U. L.J. 1173, 1200 n.193 (2011) (explaining that the Elective Procedure "is likely to be more expensive" due to the "technicalities and requirements of formal dissolution," but that "it provides shareholders with more security in the assets they do receive, thus providing them with a cognizable benefit").

(iv)   The dissolved corporation may offer security to a claimant for an unrejected claim, which is deemed accepted "as the sole source from which to satisfy the claim against the corporation" if the claimant does not object within 120 days. *See id.* § 280(b)(2).

(v)   The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be sufficient to provide compensation" for any claim where the corporation's offer of security was rejected. *See id.* § 280(c)(2).

(vi)   The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party." *See id.* § 280(c)(1).

(vii)   The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 5 years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years." *See id.* § 280(c)(3).

After following this process, paying or providing for claims, and posting the required security, "[a]ny remaining assets shall be distributed to the stockholders of the dissolved corporation." *Id.* § 281(a).

### 3. The Challenges Inherent In Determining The Amount And Form Of Security

The creation of the Elective Path did not eliminate the fundamentally difficult challenges involved in determining the amount and form of security. The risk invariably remains that a reserve or other provision for payment will not prove sufficient for a creditor's claim. If stockholders have received a liquidating distribution based on an

amount of security that later proves inadequate, then those stockholders have jumped the line and received a distribution to which they were not entitled, contravening the rule of absolute priority. The Elective Path merely shifts the responsibility for making the decision about security from the directors to the court. Indeed, the cost of providing greater certainty for directors and stockholders is increased risk for creditors, because a claimant has far less ability to challenge a judicial judgment as to the amount of security.

When a court makes a determination regarding security, that determination has two effects. The first order effect is to cap the amount that the claimant can recover if it prevails on its claim. If the reserve proves inadequate, then the claimant's rights are impaired.

There also is a second order effect. Because the amount of the reserve caps the claimant's potential recovery, the parties necessarily will update their assessments of the claim. Those updated assessments in turn affect settlement value, the existence of a zone of potential agreement, and whether the case goes to trial. The setting of security thus feeds back into and affects the litigation over the claim.

A simplified example illustrates the second order effect. Assume that a dissolved corporation has $1,000,000 in assets and confronts a single potential liability, consisting of a claim, currently in litigation, where the plaintiff seeks to recover $900,000. Assume that the plaintiff perceives the expected outcomes as comprising a triangular distribution consisting of a minimum, maximum, and most likely outcome. As the plaintiff sees it, there is (i) a 25% chance that the corporation prevails and the claim is worth $0, (ii) a 5% chance that the plaintiff prevails and the claim is worth $900,000, and (iii) a 70% chance that the plaintiff prevails and the claim is worth $500,000. Assume that the cost of litigating the

32

case through judgment for the corporation is $50,000. The expected value of the claim to the plaintiff is $345,000.[10] Because the corporation has $1,000,000 in assets, there is no question about the corporation having the funds to pay, so the expected value of the litigation from the plaintiff's standpoint remains $345,000.

Now consider the claim from the corporation's side. Assume that the corporation believes there is (i) a 50% chance that the corporation prevails and the claim is worth $0, (ii) a 20% chance that the plaintiff prevails and the claim is worth $900,000, and (iii) a 30% chance that the plaintiff prevails and the claim is worth $500,000. Assume that the cost of litigating the case through judgment for the corporation is also $50,000. The net expected value of the claim for the corporation is equal to $-380,000.[11]

Under a simplifying set of assumptions that treats settling the case as costless and the parties as risk neutral, the plaintiff should be willing to settle for any amount greater than $345,000, and the corporation should be willing to settle for any amount less than $380,000. *See* Steven Shavell, *Foundations of Economic Analysis of Law* 401 (2004); Kathryn E. Spier, *Litigation*, *in The Handbook of Law and Economics* 268–69 (A. Mitchell Polinsky & Steven Shavell eds., 2007). Each figure represents that party's reservation price. *See* Robert F. Bruner, *Applied Mergers & Acquisitions* 789 n.2 (2004). The range

---

[10] (25% * $0) + (5% * $900,000) + (70% * $500,000) - $50,000 = $0 + $45,000 + $350,000 - $50,000 = $345,000.

[11] (50% * $0) + (20% * $-900,000) + (30% * $-500,000) - $50,000 = $0 - $180,000 - $150,000 - $50,000 = $-380,000.

between the plaintiff's minimum settlement price of $345,001 and the corporation's maximum settlement price of $379,999 creates a zone of potential agreement. *See id.* If the parties are rational, then they should reach a settlement within the zone.

Now assume that the corporation is following the Elective Process and convinces this court that its assessment of the litigation reflects the likely outcome. The court requires the corporation to post security of $380,000, then permits the corporation to distributes its surplus assets to stockholders.

Under the first order effect, the plaintiff's recovery is capped at $380,000. No matter how the litigation turns out, the plaintiff cannot recover more than $380,000.

Under the second order effect, that new reality immediately causes the parties to update their assessments of the litigation, and the updated assessments result in a new and lower zone of potential agreement. From the plaintiff's side, the scenarios in which the plaintiff recovers are capped at the amount of the reserve, reducing the expected value of the claim to $235,000.[12] The same is true for the corporation, changing its expected value to $-240,000.[13] Based on the updated assessments, the plaintiff will settle for any amount greater than $235,000, and the corporation will settle for any amount less than $240,000. The lower zone of potential agreement generates a lower settlement.

---

[12] (25% * $0) + (5% * $380,000) + (70% * $380,000) - $50,000 = $0 + $19,000 + $266,000 - $50,000 = $235,000.

[13] (50% * $0) + (20% * $-380,000) + (30% * $-380,000) - $50,000 = $0 - $76,000 - $114,000 - $50,000 = $-240,000.

34

With some minor changes in the assumptions, the setting of the reserve results in there being no zone of potential agreement. Reducing the cost of litigation from $50,000 to $40,000 and otherwise keeping the original assumptions, cuts the plaintiff's expected value to $355,000. It changes the corporation's expected value to $-370,000. There still is a zone of potential agreement. But if the corporation convinces this court to adopt its expectation as the likely outcome and set security at $370,000, then the plaintiff's expected value falls to $237,500, while the corporation's expected value changes to $-225,000.[14] There no longer is any zone of potential agreement. Under this scenario, this court's decision on security creates a situation in which rational actors will press the claim to trial, forcing a sister court to hear a case that otherwise would have settled.

It is easy to play with assumptions to generate different outcomes. In the real world there are many more variables with outcomes that are impossible to predict. The lessons, however, are easy to perceive.

---

[14] After the reserve is set at $370,000, the net expected value of the claim to the plaintiff is equal to $237,500, or (25% * $0) + (5% * $370,000) + (70% * $370,000) - $40,000 = $0 + $18,500 + $259,000 - $40,000 = $237,500. The net expected value of the claim to the corporation is equal to $-225,000, or (50% * $0) - (20% * $-370,000) - (30% * $-370,000) - $40,000 = $0 - $74,000 - $111,000 - $40,000 = $-225,000. A rational plaintiff only will be willing to settle for an amount greater than $237,500. A rational defendant only will be willing to settle for an amount less than $225,000. Therefore, the parties rationally will not settle and instead will proceed to trial.

The first lesson is that a judicial decision to set a reserve for a claim pending in a sister court necessarily affects how that litigation proceeds. Even if this court gets the probability distribution right and sets security at what the expected value of the claim would have been, that judicial act will cause the litigants to update their assessments. And that process in turn will cause the probability distribution to change.[15]

_____

[15] For visual thinkers, imagine three stylized distribution curves, and envision that a court sets the amount of security at a measure of central tendency, such as the mean. By doing so, the court eliminates the ability of the plaintiff to recover—and the risk that the corporation will have to pay—in any scenarios to the right of the mean. With the right tail of the curve eliminated, the claim now only generates left-tailed results. That fact reduces the area under the curve and resets the expected value of the claim.



In a situation in which the court sets a reserve at the expected value to the defendant, the setting of the reserve cuts off all possible outcomes to the right of the reserve amount. That act reduces the area under the curve and resets the expected value of the claim. The following table uses the simplistic assumptions from the corporation's distribution curve in the original hypothetical to illustrate the effect.

The second lesson is that using the risk-adjusted value of a claim to establish an amount of security threatens to undercompensate the claimant in two ways. First, it prevents the claimant from receiving the full value of its recovery in scenarios where the outcome exceeds the risk-adjusted assessment. Second, it undermines the ability of the claimant to recover the risk-adjusted value in a settlement, because the corporation no longer faces risk in those higher valued scenarios.

In both cases, the additional amounts that the reserve frees up for distribution to stockholders reflect amounts to which creditors with higher priority claims were entitled. The reserve thus lets the stockholders jump the line and receive distributions at the expense of creditors.

These risks manifest most clearly when a court sets a reserve for a single claim or for a small number of similar claims. When a court sets a reserve for many similar claims,

37

the law of large numbers comes into play. Some claims in the distribution will generate recoveries below the risk-adjusted outcome; others will generate recoveries above the risk-adjusted outcome. As the number of claims increases, the weighted average of the actual outcomes approaches the risk-adjusted outcome. The different recoveries balance out, and the setting of security does not result in the undercompensation of claimants. *See generally* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in Annotated Reference Manual on Scientific Evidence* 117–21 & n.117 (2d ed. Michael J. Saks et al. eds., 2005).

## B. The Applicable Standard

The foregoing concepts inform the court's determination of the amount of security that the Company must retain for Verizon's claim to indemnification relating to the National Customer Class Actions (the "Indemnification Claim"). The initial question for decision is the standard that the court will use when determining the amount and form of security. The Company argues that it need only provide security that is "reasonably likely to be sufficient to provide compensation" for the claim (the "Reasonableness Standard"). Verizon argues that the Company must provide an amount of security that "is sufficient to provide compensation to the claimant if the claim matures" (the "Sufficiency Standard").

The dispute over the operative standard derives from differences in the statutory language. It is helpful to start with an overview of the standards that are in play.

The Elective Path and the Default Path each establish standards for three categories of claims. The first category encompasses claims against the corporation that are the

38

subject of pending litigation ("Litigation Claims"). The Elective Path frames the standard

as follows:

> A corporation . . . shall petition the Court of Chancery to determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party.

8 *Del. C.* § 280(c)(1). The Default Path defines the standard in similar terms: "A dissolved

corporation . . . shall make such provision as will be reasonably likely to be sufficient to

provide compensation for any claim against the corporation which is the subject of a

pending action, suit or proceeding to which the corporation is a party." *Id.* § 281(b)(ii).

Both paths thus use the Reasonableness Standard for Litigation Claims.

The second category encompasses claims that have not yet arisen but are likely to

arise ("Likely Claims"). The Elective Path defines the standard as follows:

> A corporation . . . shall petition the Court of Chancery to determine the amount and form of security which will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation . . . , are likely to arise or to become known to the corporation . . . within 5 years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years after the date of dissolution.

*Id.* § 280(c)(3). The Default Path again defines the standard in similar terms, albeit with a

default time period of ten years rather than five years:

> A dissolved corporation . . . shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation . . . , are likely to arise or to become known to the corporation . . . within 10 years after the date of dissolution.

39

*Id.* § 281(b)(iii). Both paths thus use the Reasonableness Standard for Likely Claims.

The last category is different. The Elective Path requires that the corporation offer "any claimant on a contract whose claim is contingent, conditional or unmatured such security as the corporation . . . determines is sufficient to provide compensation to the claimant if the claim matures." *Id.* § 280(b)(2). The Elective Path thus (i) zeroes in on contractual claimants with claims that are "contingent, conditional or unmatured" (a "Contingent Contractual Claim"), (ii) provides that the determination must assume that the claim matures, and (iii) requires security that "is sufficient to provide compensation." *Id.* If the claimant rejects the amount of security and the parties cannot reach agreement, then the corporation "shall petition the Court of Chancery to determine the amount and form of security that *will be sufficient* to provide compensation to any claimant who has rejected the offer for security made pursuant to paragraph (b)(2)." *Id.* § 280(c)(2) (emphasis added). The Elective Path thus uses the Sufficiency Standard for Contingent Contractual Claims.

The Default Path takes a different approach. It states that the corporation "shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims known to the corporation." *Id.* § 281(b)(i). By using the phrase "pay or make reasonable provision," the Default Path suggests that the corporation must pay the claims in full or "make reasonable provision" to pay them. The Default Path thus includes "contingent, conditional or unmatured contractual claims known to the corporation" within a category of claims subject to the Reasonableness Standard. *In re Delta Hldgs., Inc.*, 2004 WL 1752857, at *6 (Del. Ch. July 26, 2004) (quoting 8 *Del. C.* § 281(b)). The Default Path also does not mandate that the amount of security be

40

determined "if the claim matures." *See* 8 *Del. C.* § 281(b)(i). This court has held that under the Default Path, a corporation can "take into account the likelihood of a triggering event" when determining the amount of security that is reasonably likely to be sufficient for a contingent contractual claim. *Delta Hldgs.*, 2004 WL 1752857, at *7.

Verizon argues that the Indemnification Claim is a Contingent Contractual Claim and hence subject to the Sufficiency Standard. Verizon further argues that the Sufficiency Standard contemplates a more protective and creditor-friendly approach for Contingent Contractual Claims than other types of claims.[16] The Company argues, by contrast, that the Reasonableness Standard applies. And the Company maintains that when a claim ultimately turns on the outcome of underlying litigation, the standards are effectively the same.

When interpreting a statute, the court's task is to "ascertain and give effect to the intent of the legislature." *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985). If the statute uses unambiguous language, then the court must adhere to its plain meaning. *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 286 (Del. 2016). The court strives to "ascribe a purpose to the General Assembly's use of statutory language,

---

[16] Dkt. 266 at 25; *see* Russell C. Silberglied & Nathaniel J. Stuhlmiller, *Delaware's Long-Form Dissolution Statute: An Underutilized Alternative*, at 2 n.19 (Sept. 1, 2015), https://www.morrisanderson.com/delawares-long-form-dissolution-statute-an-underutilized-alternative/ (last visited Oct. 8, 2021)) (observing in a footnote that the Sufficiency Standard differs textually from the Reasonableness Standard, flagging the absence of any cases addressing the distinction, and suggesting that "the statute arguably requires the Court to take a more protective, creditor-friendly approach when determining the amount of security required for contingent contractual claims").

41

construing it against surplusage, if reasonably possible." *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011). "When the plain language of a statute produces a rational result, a court's task is to apply the statute as written."[17]

Both standards start with the concept of sufficiency. Black's Law Dictionary defines "sufficient" to mean "[a]dequate; of such quality, force, or value as is necessary for a given purpose." *Sufficient*, Black's Law Dictionary (11th ed. 2019).

After starting from the same basic concept, however, the two tests diverge. The Sufficiency Standard is unqualified. It requires security that "will be sufficient." It thus requires something close to certainty that the security will be adequate for the given purpose. To the extent that the court imagines a distribution curve of outcomes on the claim, the Sufficiency Standard calls for a form and amount of security that lies at the right end of the curve or close to it. The Sufficiency Standard also requires that the court set security that will be sufficient "if the claim matures." The statute thus prevents the court from discounting the amount of security based on the likelihood of the claim maturing.

---

[17] *In re Rural Metro Corp.*, 88 A.3d 54, 87 (Del. Ch. 2014) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011)); *see Wild Meadows MHC, LLC v. Weidman*, 250 A.3d 751, 756–57 (Del. 2021) ("If a statute is not reasonably susceptible to different conclusions or interpretations, courts must apply the words as written, unless the result of such a literal application could not have been intended by the legislature." (alteration and internal quotation marks omitted)); *Zhurbin v. State*, 104 A.3d 108, 112 (Del. 2014) ("In interpreting a statute, our primary job is to honor its apparent purpose based on a sensible reading of the text . . . ." (omission in original) (internal quotation marks omitted)); *see also Hunt v. Div. of Fam. Servs.*, 146 A.3d 1051, 1063 (Del. 2015) (Delaware courts avoid interpreting statutes in a way that "would lead to an irrational result that is incongruent with the statute's clear focus").

The Reasonableness Standard is different. It calls for security that is "reasonably likely to be sufficient," thereby qualifying the concept of sufficiency with the adverbial phrase "reasonably likely." Something is "likely" to occur if it is more probable than not to occur.[18] The use of the adverb "reasonably" introduces an additional measure of play in the joints.[19] The combination permits the court to move further away from the right side of the curve, if the facts warrant. The Reasonableness Standard also does not contain any prohibition on the court considering the likelihood that a conditional claim will mature.

---

[18] *See, e.g.*, *Likely*, Black's Law Dictionary (11th ed. 2019) (defining "likely" as "[a]pparently true or real; probable" or "[s]howing a strong tendency; reasonably expected"); *cf. In re Family Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at *16 (Del. Ch. Dec. 29, 2014) ("Something with an approximately 60% chance of failure, in my view, is not 'reasonably likely' to occur.").

[19] *See, e.g., AB Stable VII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *91 (Del. Ch. Nov. 30, 2020) (explaining that the use of the qualifier "reasonable" results in a "somewhat lesser standard" than a flat contractual requirement (quoting ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 212 (2d ed. 2010))); *see also Reasonable*, Black's Law Dictionary (11th ed. 2019) (defining "reasonable" as "[f]air, proper, or moderate under the circumstances").

The reference to reasonableness also recognizes that the court must make an objective determination, as in what "a reasonable person would believe," rather than deferring to some degree to the judgment of the liquidating agent. *See RegO*, 623 A.2d at 109 (explaining that "due respect for the expertise and authority of corporate directors does not dictate deference to their judgment on the question of what adequate protections to various competing classes of claimants on dissolution"); *Boesky*, 1988 WL 42250, at *16 ("a liquidating trustee's judgment as to what constitutes adequate security, even when made in good faith and advisedly is not entitled to the powerful effects of the business judgment rule; . . . in such a setting, it is inescapably the function of the court hat supervises the liquidation to make an independent judgment of the adequacy of such security"). Nothing precludes the phrase "reasonably likely" from fulfilling both roles, *viz.*, permitting a greater degree of judicial judgment and confirming the need for an objective assessment.

The Elective Path expressly applies the Reasonableness Standard to Litigation Claims and Likely Claims. It expressly applies the Sufficiency Standard to Contingent Contractual Claims. The plain language of the statute thus differentiates between the types of claims and imposes a different standard.

The evolution of the dissolution statute supports this interpretation. When the General Assembly created the Elective Path in 1987, the statute required that "any claimant whose claim is contingent, conditional or unmatured" receive security "sufficient to provide compensation to the claimant if the claim matures." Del. S.B. 93, 134th Gen. Assem. § 38 (1987). The original language thus did not limit the Sufficiency Standard to contingent claims sounding in contract but rather extended its reach to any contingent, conditional, or unmatured claims. And in place of the current subsection addressing Likely Claims, the original statute called on the Court of Chancery "to determine the amount and form of security which will be sufficient to provide compensation to claimants whose claims are known to the corporation . . . but whose identities are unknown." *Id.* The original statute thus applied the Sufficiency Standard to those claims as well.

Subsequent amendments narrowed the application of the Sufficiency Standard. In 1990, the General Assembly replaced the reference to "any claimant whose claim is contingent, conditional or unmatured" with the current limitation to Contingent Contractual Claims. The General Assembly also amended the statute to substitute the concept of Likely Claims for the category of known claimants with unknown identities, while at the same time replacing the Sufficiency Standard with the Reasonableness Standard for purposes of determining security for those claims. *See* Del. S.B. 467, 135th

44

Gen. Assem. § 24 (1990). And in 1994, the General Assembly amended the statute again to introduce the category of Litigation Claims and apply the Reasonableness Standard to those claims. Del. S.B. 357, 137th Gen. Assem. § 17 (1994).

After these amendments, the Sufficiency Standard continues to govern only as to Contingent Contractual Claims. The changes that the General Assembly has made evidence a conscious decision to apply the Sufficiency Standard to Contingent Contractual Claims.

There are sound reasons why the General Assembly could have decided rationally to distinguish between Contingent Contractual Claims and other types of claims. By singling out Contingent Contractual Claims, the General Assembly identified claims where the corporation has made a contractual commitment to a counterparty. That commitment gives the holder of a Contingent Contractual Claim a bargained-for property interest. *See Krafft-Murphy*, 82 A.3d at 698 ("[C]ontingent contractual rights . . . constitute 'property' . . . , so long as those rights are capable of vesting."). Under Delaware law, that type of property interest is a significant thing. Delaware prides itself on having a strongly contractarian law.

> This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements; where Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits.

*Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015). "Delaware upholds the freedom of contract and enforces as a matter of fundamental

public policy the voluntary agreements of sophisticated parties." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009).

The General Assembly could have concluded rationally that applying the Sufficiency Standard to Contingent Contractual Claims would protect the sanctity of contract and recognize the significance of a bargained-for commitment. Applying the Reasonableness Standard to Contingent Contractual Claims would create a greater risk that a dissolved corporation could convince a court to reduce the scope of its bargained-for commitment, effectively countenancing a judicially imposed amendment. By contrast, the broader category of Litigation Claims and the more general category of Likely Claims rely on background principles of law that form the legal ecosystem in which parties operate. Claims based on those principles are creations of the State, making the rights they create more readily susceptible to modification by a court through the dissolution process. It is of course true that the law of contract is itself part of that legal ecosystem and a creation of the State. Yet by entering into a contract, the corporation builds on that law and adds a layer of voluntary commitment. The General Assembly could conclude rationally to give weight to that voluntary commitment when requiring security.

The General Assembly also could have decided rationally to use a Sufficiency Standard for Contingent Contractual Claims under the Elective Path while using a Reasonableness Standard for those same claims under the Default Path. By following the Elective Path, directors insulate themselves from personal liability for an excessive distribution, and stockholders are protected against claw backs. The holder of a Contingent Contractual Claim should have greater certainty about the sufficiency of the security given

46

the absence of alternative remedies. Under the Default Path, the considerations differ. The holder of a Contingent Contractual Claim can more readily challenge the directors' compliance with the statute, creating a potential alternative source of recovery. In that setting, the use of the Reasonableness Standard helps protect the directors. The General Assembly thus rationally could conclude that for purposes of Contingent Contractual Claims, the Elective Path should use the stricter Sufficiency Standard, while the Default Path should use the less strict Reasonableness Standard.

The Company has cited cases that it views as supporting the application of the Reasonableness Standard to Contingent Contractual Claims. The Company's main authority is *Delta Holdings*, but that case applied the Reasonableness Standard because the corporation followed the Default Path.[20] Evidencing that fact, the *Delta Holdings* decision discounted the value of the claims based on the likelihood that the right to indemnification would vest.[21] That is permissible under the Default Path but not under the Elective Path.

---

[20] *See Delta Hldgs.*, 2004 WL 1752857, at *6 ("Delta Holdings did not elect to pursue the elective procedure. Thus, Section 281(b) governs."); *id.* (quoting Section 281(b) and applying the Reasonableness Standard).

[21] *See id.* at *5 n.43 ("Of course, even [for] a present, contingent claim, likelihood of the claim vesting . . . is to be taken into consideration in determining [the] 'reasonableness' of Delta Holdings' provision."); *id.* at *7 (holding that under the Default Path, a corporation can "take into account the likelihood of a triggering event" when determining the amount of security that is reasonably likely to be sufficient for a contingent contractual claim); *id.* at *8 (explain that in evaluating the sufficiency of the corporation's proposed security, the court "will take into account the likelihood of the contractual indemnification claim vesting, the likely value of that claim, and the financial condition of the distributing company"); *id.* at *8 n.55 (explaining that the court would "discount the

47

The *Delta Holdings* case does not support applying the Reasonableness Standard to Contingent Contractual Claims under the Elective Path.

The Company also cites *In re Swisher Hygiene, Inc.*, 2020 WL 3125415 (Del. Ch. June 12, 2020), where this court ruled on a series of challenges to a proposed interim distribution. *See id.* at *2. One objector was a plaintiff with pending lawsuits against the company in New York. The company had followed the Elective Path, but the claims in question were Litigation Claims subject to the Reasonableness Standard, not Contingent Contractual Claims subject to the Sufficiency Standard. *See id.* at *4. The *Swisher Hygiene* case does not support applying the Reasonableness Standard to Contingent Contractual Claims under the Elective Path.

Finally, the Company cites *Blue Chip Capital Fund II Limited Partnership v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006), for the proposition that reserving the maximum potential amount that a claimant might be able to recover under an indemnification right was "not necessarily reasonable." *Id.* at 836. The *Blue Chip* decision involved a controlled corporation whose management team set a reserve that affected the calculation of a payment due to minority preferred stockholders under the certificate of designations that governed their security. *See id.* at 829–30. The court took pains to note that the case did *not* arise under the dissolution statute. In a passage where the court looked by analogy to the dissolution statute, the court analogized the Default Path and the Reasonableness

---

amount required to reasonably provide for contingent indemnification claims by the likelihood of such underlying claims arising").

48

Standard, not the Elective Path and the Sufficiency Standard. *See id.* at 836. The court also relied on *Delta Holdings* for the proposition that the court could discount the amount of security based on the likelihood that the indemnification would mature. *See id.* That is not permissible under the Elective Path. The *Blue Chip* case thus also does not support applying the Reasonableness Standard to Contingent Contractual Claims under the Elective Path.

For purposes of determining their appropriate category, rights to indemnification "are present contractual rights." *Delta Hldgs.*, 2004 WL 1752857, at *7. A claim for indemnification does not mature until the indemnified party suffers an indemnifiable loss, but before that point, the indemnified party nevertheless has a Contingent Contractual Claim for which security must be provided. *See id.* (holding that the rights to indemnification held by directors and officers were "present (albeit contingent)" contractual claims for purposes of determining security under the Default Path); *Boesky*, 1988 WL 42250, at *16 (treating an unmatured claim for indemnification as an existing albeit contingent claim for which security was required). The Indemnification Claim therefore is a Contingent Contractual Claim, and the Sufficiency Standard governs.

## C.      Applying The Standard

Concluding that the Sufficiency Standard applies is only the first step. Determining an amount and form of security that "will be sufficient" necessarily involves prediction. "An observation attributed variously to Mark Twain, Yogi Berra, and Niels Bohr (among others) holds true for dissolution: It's difficult to make predictions, especially about the future." *Altaba*, 241 A.3d at 776. When confronted with the challenge of determining sufficient security for unliquidated and contingent contractual claims, Chancellor Allen

49

observed dryly that "such a judgment will inevitably present a task that requires much thought." *Boesky*, 1988 WL 42250, at *16.

If the court is considering a Contingent Contractual Claim that has a definite value on maturity, such as the amount due under a note, then the court can apply the Sufficiency Standard with some degree of confidence and set the security at the amount due on maturity. The Sufficiency Standard requires that the court evaluate the amount of security that will be sufficient "if the claim matures," and the court therefore cannot discount the contractual claim by the likelihood that it will not mature. The Reasonableness Standard, by contrast, permits consideration of maturity risk. But for that distinction, the Reasonableness Standard could well generate the same result as the Sufficiency Standard. If the amount of the claim is clear, a judge analyzing the amount of security reasonably likely to satisfy the claim would focus similarly on the amount due.

When a Contingent Contractual Claim involves indemnification for underlying litigation, however, the analysis is more complex. Here, the amount of the Indemnification Claim will depend on the outcome of the National Customer Class Actions. Based on this fact, the Company argues that the Indemnification Claim is really a Litigation Claim in disguise to which the Reasonableness Standard should apply. That is incorrect.

A Contingent Contractual Claim that seeks indemnification for a liability that will be generated by the outcome of underlying litigation involves two separate claims. The first is the underlying lawsuit which, if resolved adversely to the indemnified party, gives rise to the claim for indemnification. Only once that liability arises does the contractual

claim for indemnification ripen. The contractual claim is the second claim, and that second claim is the Contingent Contractual Claim to which the Sufficiency Standard applies.

The question therefore becomes how to incorporate the variability in the underlying claim. Verizon asserts that because the statute refers to providing security "sufficient to provide compensation to the claimant if the claim matures," then the court must assume a worst case result on the underlying claim, i.e., the maximum damages that could arise. The statutory language does not support that approach. A Contingent Contractual Claim could mature based on a range of results in the underlying case. Maximum liability is not required. The phrase "if the claim matures" thus does not call for a worst-case estimate in the underlying litigation. It calls for taking into account the range of possibilities that could exist "if the claim matures."

## 1. The Possible Outcomes In The National Customer Class Actions

Broadly speaking, there are four possible outcomes in the National Customer Class Actions. In the first scenario, the Court of Appeals affirms the Settlement Decision and the Settlement becomes final (the "Affirmance Scenario"). In that scenario, the National Customer Class Actions are over.

The other scenarios arise if the Court of Appeals reverses the Settlement Decision and remands for further proceedings. Because the only substantive challenge on appeal asserts that the District Court should not have approved AllClear ID as the vendor for credit monitoring, these scenarios assume that the Court of Appeals reverses on that basis. It is possible, however, that the Court of Appeals could express or imply views regarding other aspects of the Settlement, such as comments to the effect that it should have been larger.

51

In the second scenario, the parties address the issue that gave rise to the appeal: the use of AllClear ID as the vendor. Fixing that issue is simple: the parties choose a new vendor (the "New Vendor Scenario"). Because the District Court approved the Settlement before, the District Court can be expected to approve the Settlement again. With the flaw in the Settlement cured, the National Customer Class Actions end.

In the third scenario, the plaintiffs use the District Court's comments about expecting greater settlement consideration, together with any similar comments by the Court of Appeals, to extract a larger settlement. Based on the District Court's comments regarding the size of the Settlement and the advantages of settlement relative to a litigated outcome, that outcome seems plausible (the "Larger Settlement Scenario"). A new settlement also would involve the selection of a new vendor. Because the District Court approved the Settlement, the District Court can be expected to approve a more generous version. The new settlement brings the National Customer Class Actions to a close.

In the fourth scenario, the plaintiffs draw on the District Court's comments about the strength of their claims, together with any supporting comments by the Court of Appeals, and decide to engage in further litigation (the "Litigation Scenario"). Discovery ensues, and the case heads towards trial. The case ends in a judgment, or it could end in a new settlement.

This description oversimplifies the universe of outcomes. Among other possibilities, the parties to the Settlement could agree on a new vendor and moot that aspect of the appeal. Or the Court of Appeals might reverse the Settlement Decision but invite the District Court to make additional factual findings to support the selection of AllClear ID.

52

For scenarios with longer timelines and more moving parts, such as the Larger Settlement Scenario and the Litigation Scenario, the possible outcomes multiply.

### 2. Assessing Whether The Company's Security Will Be Sufficient

The Company argues that the $58.75 million that it paid to fund its share of the Settlement is reasonably likely to be sufficient to satisfy the Indemnification Claim because it is virtually certain that the Court of Appeals will affirm the Settlement Decision. The Company asks the court to conclude that only the Affirmance Scenario is viable and ignore the other possibilities.

The Company's argument fails initially because the court must apply the Sufficiency Standard, not the Reasonableness Standard. The Sufficiency Standard also requires that the court determine an amount of security that "will be sufficient if the claim matures." Under the Affirmance Scenario, the National Customer Class Actions will be over, Verizon will not incur any indemnifiable losses, and the Indemnification Claim will not mature. The Affirmance Scenario on which the Company's argument depends is not one that the court can consider when evaluating the amount of security that will be sufficient for a Contingent Contractual Claim.

The same analysis applies to the New Vendor Scenario. The Company argues persuasively that given the dynamics involved in the settlement process, that scenario is the most likely alternative if the Settlement Decision is reversed. The plaintiffs have demonstrated that they are happy with the value of the Settlement, and the District Court has already approved it. Perhaps most importantly, the attorneys representing the putative class already have received their fee award under a quick-pay provision that allowed them

to receive their share of the settlement fund pending the outcome of the appeal. And because the District Court set the fee award based on a lodestar, not the benefit to the class, the Larger Settlement Scenario is not likely to generate a larger fee award. Returning money that has already landed in their pockets to pursue the Larger Settlement Scenario would be an unattractive option for plaintiffs' counsel. The Litigation Scenario could generate a higher fee award, but with increased risk, and it too requires returning the existing fee award. Under the circumstances, the plaintiffs' lawyers are likely to have an interest in making only the tweaks necessary to fix the Settlement.

Under the New Vendor Scenario, the parties select a new vendor, but the settlement consideration does not change. As in the Affirmance Scenario, Verizon does not incur any indemnifiable losses, and the Indemnification Claim does not mature. The New Vendor Scenario thus also is not one that the court can consider when evaluating the amount of security that will be sufficient for a Contingent Contractual Claim.

The two scenarios that the court must consider are the Larger Settlement Scenario and the Litigation Scenario. Those scenarios are admittedly unlikely, but they are the scenarios in which the indemnification claim "will mature."

In each of those scenarios, $58.75 million will not be sufficient to satisfy the Indemnification Claim. In the Larger Settlement Scenario, with the Company's liability capped at $58.75 million, Verizon will bear 100% of the increased cost. In the Litigation Scenario, to the extent any adverse judgment exceeds $58.75 million, Verizon again will bear 100% of the cost. Verizon's expert opined persuasively that if the case proceeds to

trial and a jury finds in favor of the plaintiffs, then a judgment greater than $1 billion would be "easy to imagine." Shavell Tr. 669.

These are admittedly low probability events. The Company and Verizon both believe that the appeal is without merit. I share their view that the Settlement Decision should be affirmed, and I regard it as by far the most likely outcome. The Sufficiency Standard, however, requires a different approach.

The deeper question that this case poses is how to determine the amount of security that is warranted to protect against low probability events such as these which, if they come to pass, could result in significant liability. Both existing precedent and policy considerations call for favoring the interests of the creditor.

### a. *Boesky*

In the *Boesky* case, Chancellor Allen confronted the same challenge of determining whether the security offered by a proposed plan of liquidation was sufficient in light of contingent contractual claims to indemnification. Despite agreeing that it was highly unlikely that that the litigation would result in any claims for indemnification, Chancellor Allen found that the security was insufficient.

The *Boesky* decision addressed an application by various creditors and limited partners to enjoin a partial liquidating distribution that a liquidating trustee proposed to make to some, but not all, of the limited partners of Delaware limited partnership known as CX Partners, L.P. The partnership had been one of several related partnerships managed by Ivan Boesky, who had consented to the entry of judgment against him in a civil enforcement action asserting securities fraud and had also pled guilty to a one-count

55

indictment charging him with making false securities filings. *Boesky*, 1988 WL 42250, at *2.

The events resulted in the dissolution of the partnership and the appointment of an independent and disinterested law professor as liquidating trustee. *Id.* The revelations surrounding Boesky also gave rise to numerous claims against Boesky and his affiliates. *Id.* at *3–4. Two of Boesky's affiliates possessed rights to indemnification against CX. *Id.* at *15. They challenged the plan of distribution because it made no specific provision for their contingent claims for indemnification. *Id.* They also argued that the amount of the funds that CX would have remaining after the partial liquidating distribution—either $95 million or $60 million, depending on how the distribution was structured—did not provide sufficient security. *Id.* at *16.

Chancellor Allen observed that when establishing an amount of security, "[o]bviously, the most conservative technique in that regard would be to set aside the full amount of the claim, at least assuming that it appears to be a litigable claim." *Id.* Anticipating observations made earlier in this opinion, he explained that

> [t]o discount the claim by a probability of its success and to reserve only the discounted value might work in the rare instance in which there were a sufficiently large number of similar claims so that statistical techniques might apply. Where, however, there are few claims or each is quite different, such a technique obviously raises a danger to those who ultimately do prove a contested claim.

*Id.*

On the facts before him, Chancellor Allen saw no need to engage in further analysis of the amount of security that might be required, because he concluded that when an entity

56

sought to distribute assets to equity holders "before either all creditors have been paid, or actually funded (*i.e.*, dollar for dollar) and segregated reserves for their claims have been established, it is the burden of such liquidating agency to persuade a court that adequate security for the payment of such claims has been provided." *Id.* at *17. Chancellor Allen concluded that the partnership had not carried that burden because the plan of dissolution did not account for any potential liability to the holders of the indemnification claims.

In reaching this conclusion, Chancellor Allen focused on two pending lawsuits. In the first, a bidder asserted that it had overpaid in an acquisition because of insider trading by Boesky and his confederates. A court had dismissed the lawsuit for failure to state a claim for relief, and the bidder had appealed. The liquidating trustee argued that the appeal was meritless, but Chancellor Allen was not willing to ignore the prospect of reversal and a possible judgment that could give rise to an indemnification claim.

> While I have no basis, for example, to believe there is a substantial risk that the Court of Appeals for the Seventh Circuit will reverse the dismissal . . ., I cannot say that there is no risk of that result or that, if there is a reversal, a substantial liability to CX, directly or through indemnification claims, will not ensue. My impression is that that is a remote prospect, but it exists.

*Id.*

The second litigation involved suits by investors who claimed to have suffered trading losses because of Boesky's activities. A tentative settlement had been reached in those cases that looked primarily to payments from a separate fund created by the SEC. *Id.* at *3. The liquidating trustee believed that the affiliates with indemnification rights might at most result in claims against the partnership of $4 million, which the partnership's

remaining assets easily could satisfy. Once again, Chancellor Allen did not find that persuasive.

> [T]he Liquidating Partner has . . . moved ahead before the so-called trading cases are fully settled. The fact that matters are not yet resolved inescapably introduces risks into the environment. While $95 million (or $60 million [under a modified plan]) is a great deal of money, it could be exhausted by these claims, and if there are valid indemnification claims (perhaps a slight risk itself), they could not be satisfied by any assets of CX.

*Id.* at *17.

The *Boesky* case thus presented a situation in which the likelihood of claims for indemnification was quite low, but if they arose, then those claims could entail high-dollar liabilities that the partnership's assets could not satisfy. In light of the uncertainty surrounding those and other issues, Chancellor Allen enjoined the plan of distribution as providing insufficient security. He suggested, however, that adequate security could be provided if the partners receiving the early distribution submitted to the court and provided undertakings to satisfy any judgment entered against the partnership relating to the claims. The resulting contractual security would account for the uncertain nature of the risk.

Like *Boesky*, the current case involves a party with contractual indemnification rights. As in *Boesky*, the likelihood that Verizon will have a claim for indemnification is low, but if that claim matures, then the Company's proposed security will not satisfy it. Under the *Boesky* precedent, the Company's security is insufficient.

### b. *Delta Holdings*

The second precedent is *Delta Holdings*. There, the directors and officers of Delta Re, a dissolved reinsurer, enjoyed rights to indemnification under the company's

constitutive documents. With the reinsurer in receivership, its parent company, Delta Holdings, pursued dissolution under the Elective Path. The directors and officers of Delta Holdings feared that if Delta Re's reserves for incurred-but-not-realized ("IBNR") claims under the reinsurance policies it had issued proved inadequate, then the dissatisfied claimants would find ways to sue the directors and officers personally. They wanted security for their contractual claims to indemnification if that contingency came to pass.

Delta Holdings had approximately $10.5 million in net assets, proposed to distribute approximately $9.5 million to its stockholders, and planned to use $81,000 of the remaining funds to purchase an insurance policy that would provide the directors and officers with $1 million in annual coverage. *See Delta Hldgs.,* 2004 WL 1752857, at *5. The directors and officers thus would lose access to $9.5 million in net assets in return for a contractual right to $1 million in annual coverage. *Id.*

The liquidating trustee argued that the likelihood of any claims against the directors and officers was vanishingly small. The court agreed that the risk to directors was remote. In response to the directors' and officers' contention that they could be held personally liable for claims by insureds against Delta Re, the court stated bluntly, "I cannot see how that would be possible." *Id.* at *8. The court also noted that Delta Re's plan of liquidation extinguished the IBNR claims. *Id.* Despite these powerful showings, the court held that the receiver had not carried its burden of proving that the insurance policy would provide security that was reasonably likely to satisfy the directors' and officers' contractual claims for indemnification. *Id.*

The *Delta Holdings* case demonstrates the conservative approach that this court takes to contractual indemnification rights. Moreover, as this decision has noted previously, the *Delta Holdings* court reached this holding when applying the Reasonableness Standard under the Default Path and after discounting the claims for the likelihood that they would mature. The Sufficiency Standard requires security that "will be sufficient if the claim matures." The *Delta Holdings* decision thus counsels strongly in favor of rejecting the Company's proposed security.

### c. Policy Considerations

Finally, the policies governing the process of winding up a corporation's business favor Verizon and call for resolving uncertainties about security in Verizon's favor. Under the absolute priority rule, Verizon is entitled to have the Indemnification Claim paid before the Company's residual claimants receive a distribution of the remaining assets. The Company seeks to establish a lower amount of security so that it can make a larger distribution to its stockholders, before Verizon's claim is liquidated. But stockholders do not have a right to jump the line and receive distributions at the expense of creditors.

Nor, in this case, do stockholders have grounds to obtain a near-term distribution that would put Verizon's rights at risk. As this decision has explained, Delaware law contemplates a three-year winding up process, and the statute provides for automatic extensions of the corporation's existence for purposes of resolving claims that were pending at the time of dissolution or filed during the three-year period. The Company started its winding up process in October 2019. In this case, the default three-year period will last through October 2022.

60

It is true that the Elective Path seeks to provide greater certainty to directors and stockholders, and it has features which, as a practical matter, may allow a corporation to complete a winding up process more quickly. Those features include the ability to force creditors to assert or present claims within a relatively short time period or otherwise have them barred, as well as the corporation's ability to propose an amount of security that will be the sole source of the creditor's recovery unless challenged. But when a creditor has presented a claim and disputed the amount of security, nothing about the Elective Path suggests that a court should hasten to make a determination to facilitate an early distribution when allowing events to unfold will reduce or eliminate uncertainty.

Prudential considerations thus weigh against making a determination in the Company's favor at a time when more information is likely to become available soon. Although it is impossible to know when the Court of Appeals will rule, it seems likely that a decision will arrive before the end of the three-year period. Until that event occurs, Verizon should not have to bear the risk of admittedly low-probability events that nevertheless could render the Company's proposed security insufficient.

Chancellor Allen commented on these same issues in the *Boesky* decision. He noted that the liquidating trustee had created the problems that the court faced by seeking to make a liquidating distribution before the underlying lawsuits—and hence the contingent claims for indemnification—were fully resolved.

> Time would cure these problems: in time the outcome of the [bidder's] case will be known; the trading cases will be settled or not; claims of indemnification will be resolved one way or the other; and whether the excluded partners are provably wrongdoers will be litigated or settled. But the [equity investors] do not wish to wait, with their funds committed to [a]

cautious investment policy in the interim. Their choice . . . to move ahead now as if all of these matters had been resolved favorably to them, however, cannot be done. . . . [because] [i]t involves the clear breach of legal rights [owed to the affiliates entitled to indemnification].

*Boesky,* 1988 WL 42250, at \*17. Those comments hold true for this case.

A practice of moving quickly would risk turning the Elective Path into something different than what the General Assembly envisioned. The Elective Path was most clearly intended as a solution for product liability lawsuits, claims arising from mass torts, and other large-scale, long-tail liabilities that might not emerge until years after the completion of a normal winding up process. The language of Section 280 evidences the General Assembly's concern for product liability lawsuits by expressly providing that "as used in this section and in § 281 of this title, the term 'contractual claims' shall not include any implied warranty as to any product manufactured, sold, distributed or handled by the dissolved corporation." 8 *Del. C.* § 280(b)(1). In *RegO*, the seminal decision addressing the two statutory paths, Chancellor Allen explained that prior law failed adequately to address the difficulties of providing "compensation to persons injured by defective products or by undiscovered and actionable environmental injury, caused by dissolved corporations," which was an issue "of obvious social concern." 623 A.2d at 96.

The types of liabilities that the Elective Path most plainly sought to address thus involved long-dated liabilities and large numbers of claims where statistical techniques could be used to establish an amount of security with some degree of confidence. The leveling effects of large numbers of claims do not exist when this court attempts to predict the outcome of a single case. Instead, by setting an amount of security and effectively

62

capping the amount that the plaintiff can recover, the court risks affecting the outcome of litigation proceeding before a sister court. *See Boesky*, 1988 WL 42250, at \*16 ("To discount the claim by a probability of its success and to reserve only the discounted value might work in the rare instance in which there were a sufficiently large number of similar claims so that statistical techniques might apply. Where, however, there are few claims or each is quite different, such a technique obviously raises a danger to those who ultimately do prove a contested claim.").

Anticipating this issue, two distinguished practitioners envisioned a hypothetical conversation with a client who hoped to use the setting of security to limit risk in a pending lawsuit. They imagined the client facing a product liability claim in the mythical jurisdiction of Dry Gulch and asking whether "the Court of Chancery will tell that crazy judge or jury in Dry Gulch that the $2 million product liability case against the corporation is worth only $100,000 at most, as the corporation contends?" Hamermesh & Wolfe, *supra*, at 24. The practitioners proposed the following response:

> A good question, you say, and one not yet authoritatively addressed by the courts. You don't give your client much encouragement, though; the Court of Chancery is sensitive to comity and the risks of duplicative litigation. The Court will probably not encourage full-blown litigation, for security determination purposes only, of claims that were already pending in another jurisdiction and will be tried there later in any event. The "likely to be sufficient" standard suggests that security for pending litigation claims will ordinarily be the full amount of the claim, absent a finding (probably on a basis similar to summary judgment, and not binding in the other forum in any event) that judgment will not exceed some lower amount. After all, you tell your client, the judicial dissolution procedure isn't designed to resolve all the corporation's litigation worries in the dissolution proceeding itself; if the wheels of Dry Gulch justice move slowly but yield a verdict of only $500,000, the extra $1.5 million security fixed by the Court of Chancery will not have disappeared. It will be available to satisfy other claimants whose

security may prove insufficient or to permit a further distribution to stockholders.

*Id.* (footnote omitted). The practitioners thought that even under the Reasonableness Standard ("[t]he 'likely to be sufficient' test"), this court ordinarily would set security at "the full amount of the claim." *Id.*

It remains true that this court is not *required* to set an amount of security that guarantees that a plaintiff will have available the full amount of any judgment that the plaintiff could achieve in a pending lawsuit.[22] Nevertheless, policy considerations weigh heavily in favor of resolving uncertainty about the amount of security in favor of the creditor. In this case, those policies counsel in favor of rejecting the Company's proposed amount of security.

## D.     The Amount Of Security For The Indemnification Claim

The Company failed to carry its burden of proving that its proposed security for the Indemnification Claim meets the Sufficiency Standard. The only other figure in the record is Verizon's proposal of $400 million, inclusive of the $58.75 million that the Company already has paid to fund the Settlement.

---

[22] *See Swisher Hygiene*, 2020 WL 3125415, at *4 ("I am not required to guarantee that the full amount of any judgment Honeycrest *could* achieve in its New York lawsuits remains available. Rather, under 8 *Del. C.* § 280(c)(1), I must determine an amount 'reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding . . . .'" (omission in original) (quoting 8 *Del. C.* § 280(c)(1)).

The statutory mandate that the Court of Chancery "determine the amount and form of security" resembles the mandate in the appraisal statute that the court "determine the fair value of the shares." *Compare* 8 *Del. C.* § 262(h), *with id.* § 280(h). Under the appraisal statute, the Delaware Supreme Court has explained that "the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999). The Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. Or the court "may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation." Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, Corp. Prac. Series (BNA) No. 38-5th, at A-31 (2010 & Supp. 2017) (collecting cases). This court has also explained that "corporate finance is not law." *In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313 (Del. 2020). The exercise ultimately is, at bottom, "a fact-finding exercise." *Id.* These principles apply equally to the determination of security.

In its discretion, this court adopts Verizon's assessment of the amount of security that will be sufficient to satisfy the Indemnification Claim if it matures. At trial, Verizon presented the testimony of Dan Tepstein, Senior Managing Associate General Counsel of Verizon, who testified credibly regarding the basis for Verizon's request. As he explained, Verizon's holdback amount assumes total potential liabilities in the National Customer

Class Actions of $800 million or approximately $4 per class member. Although a renegotiated settlement almost certainly would come in well below that amount, an adverse judgment at trial could result in greater liability. In assessing the risk of an adverse outcome, Verizon considered that the District Court kept open the possibility of punitive damages, described the Company's conduct as "egregious," and cited a series of factors that would have supported a larger settlement. Verizon also considered the findings of a special committee of the board of directors of the Company that was highly critical of management's conduct regarding the data breaches, as well as the contents of the Company's consent order with the SEC, which found that the Company had misled investors regarding the data breaches. Verizon's expert opined that the holdback was reasonable based on his calculations regarding the upper range of liability in the National Customer Class Actions if the Settlement Decision was overturned.

In most future states of the world, the resulting amount is likely to be excessive. At the same time, the resulting amount does not guarantee Verizon the full amount that it might recover on the Indemnification Claim if the Settlement Decision is reversed and if the plaintiffs obtain a judgment against the defendants. The resulting amount represents a persuasive effort by Verizon to assess the risk that it faces, and the court adopts it.

## III. CONCLUSION

The Company shall reserve $400 million for the Indemnification Claim, inclusive of the $58.75 million that the Company has paid to fund its obligations under the Settlement. If the Court of Appeals affirms the Settlement Decision, then the Company need not retain any security for the Indemnification Claim.

66